THE LOUISVILLE AND NASHVILLE RAILROAD COMPANY

*v.*

THE ILLINOIS CENTRAL RAILROAD COMPANY.

*Opinion filed October 24, 1898.*

1. RAILROADS—*right to build railroad on land of another is an interest in land.* The right of one railroad company to build its track across the track and right of way of another company is an interest in land, which can be acquired only by proceeding under the statute or by grant, and a verbal permission to so build the track cannot be set up to defeat the enforcement of a written lease subsequently made, whereby the right to maintain the track as laid under the verbal permission is given, upon the performance of certain covenants.

2. SAME—*track-crossing agreement construed as a lease, with covenants running with the land.* A written agreement whereby one railroad company gives another the right, for a term of years, to maintain its track across the right of way and track of the former, as previously laid under verbal permission, upon the payment by the latter of a nominal annual rent and the maintaining of crossing-frogs, switchmen and signals at its own expense, constitutes a lease, the covenants of which run with the land.

3. MORTGAGES—*purchaser at foreclosure takes no greater title than mortgagor conveyed.* Upon the foreclosure of a mortgage executed by a railroad company before building its line, the purchaser and the grantees of the latter are bound by the terms of a lease executed by the mortgagor, as lessee, after the making of the mortgage, whereby it acquired the right to maintain its track across the track and right of way of another railroad company, conditioned upon its performance of certain covenants.

4. PARTIES—*one who cannot be compelled to respond to complainant's prayer is not a necessary party.* In order to render one a necessary party to a chancery proceeding it must appear that he may be compelled to respond to the prayer of complainant's bill, and if there is nothing he is called upon to do, or can be compelled to do, as a duty, he is not a necessary party.

5. EVIDENCE—*when expert testimony is properly received as explaining terms used in contract.* In determining the meaning of a covenant in a contract whereby one railroad company agrees to furnish "necessary signals and switchmen" at its crossing over the other's track, the court may permit expert witnesses to testify as to what would be the character of the "signals" necessary at that point and the duties of "switchmen" relating thereto.

6. JUDGMENTS AND DECREES—*when decree is not broader than terms of agreement which it enforces.* A decree enforcing an agreement by one railroad company to furnish "necessary signals and switchmen" at its crossing over the track of another company, is not broader than the agreement because it specifies the character of the signals to be used and the duties of the switchmen, according to expert testimony as to what was necessary at that point.

APPEAL from the Circuit Court of St. Clair county; the Hon. A. S. WILDERMAN, Judge, presiding.

J. M. HAMILL, for appellant.

WILLIAM H. GREEN, (JAMES FENTRESS, of counsel,) for appellee.

Mr. JUSTICE PHILLIPS delivered the opinion of the court:

The appellee corporation, organized in 1851 under a charter which was made a public law, procured its right of way, including that at the Ashley crossing hereinafter referred to, in 1852, and has been in its possession since that date, its road being completed to Ashley, in Washington county, in 1854. In 1869 the St. Louis and Southeastern Railway Company was incorporated, and built a railroad from a point in Illinois opposite the city of St. Louis, to Shawneetown, Illinois, *via* McLeansboro, which crossed the railroad and right of way of appellee at Ashley, where appellee's right of way is two hundred feet wide. In October, 1869, the St. Louis and Southeastern Railway Company mortgaged its railroad to two trustees. By that mortgage it appears no part of the road had been built at that date, and when it was executed there was only a proposition to build sixteen miles of railway east of Ashley, but between the making of the mortgage and the 16th of February, 1874, its railroad was built across appellee's right of way and railroad at Ashley, by permission of appellee. On the date last named an agreement was entered into between the ap-

pellee and the St. Louis and Southeastern Railway Company, as follows:

"Memorandum of agreement made this 16th day of February, 1874, by and between the Illinois Central Railroad Company of the first part, and the St. Louis and Southeastern Railway Company (consolidated) of the second part, witnesseth:

"*First*—The party of the first part, in consideration of the agreements and payments hereinafter specified to be kept and made by the party of the second part, hereby authorizes the party of the second part to maintain and use its one track as now located at Ashley, Washington county, Illinois, and also hereby authorizes the party of the second part to lay down, maintain and use a second track parallel with its present track, (with the inside rails of the two tracks not more than nine (9) feet apart,) over and across the right of way of the party of the first part, for the period of ten (10) years from the first of January, 1874, with the privilege of renewal.

"*Second*—And in consideration of this license the said St. Louis and Southeastern Railway Company (consolidated) hereby agrees to pay to said party of the first part, in advance, for each year, the sum of one dollar per annum, and also to pay all taxes that may be assessed upon the said tracks across the right of way of the party of the first part.

"*Third*—The party of the second part hereby also agrees to maintain the crossing-frogs at the intersection of the two railroads in good condition, so that they shall be at all times perfectly safe and in condition satisfactory to the general superintendent of the Illinois Central railroad; also to provide, at its own expense, the necessary signals and watchmen which may be necessary and required at the crossing for the safety of trains, and to save and keep harmless the party of the first part from the payment of all damages which may occur to the party of the second part, its trainmen, passengers and freight by reason of any collision at said crossing not arising from the gross negligence of the party of the first part.

"In witness whereof the parties hereto have set their hands and have caused their respective corporate seals to be affixed the day and year first above written.

"Signed in duplicate.

ILLINOIS CENTRAL RAILROAD CO.,
By JOHN NEWELL, *President.*
[Seal.]        ST. LOUIS AND SOUTHEASTERN RY. CO.,
By E. F. WINSLOW, *President.*"

The mortgage made in 1869 was foreclosed in 1880 in the United States Circuit Court for the Southern District of Illinois. On the 27th day of January, 1881, the property was sold by the master in chancery of said court to a purchasing committee, by whom it was conveyed to a new corporation called the Southeastern and St. Louis Railway Company, organized on the 4th of November, 1880, to purchase, maintain and operate said railroad, and the last mentioned company leased said railroad on the 27th of January, 1881, to the appellant for a term of forty-nine years, with right of perpetual renewal. The appellant refused to comply with the covenants in the contract of February 16, 1874, and appellee filed its bill to enforce specific performance of that contract. Appellant answered denying the execution of the contract, and setting up that compliance with its covenants is unnecessary for the safety of trains, and relied on an issue of law, which is, that the covenants in the contract do not bind appellant, as it is claimed they are not covenants which run with the land.

The evidence shows that the agreement which was offered in evidence, and which purported to be executed by the St. Louis and Southeastern Railway Company by its president, E. F. Winslow, was signed in the handwriting of E. F. Winslow at the time he was president of the latter named company, and that it was his genuine signature. The weight of the testimony also shows the safety of trains demanded the use of switchmen and signals, as provided in the contract. By the agreement an estate for years was carved out of appellee's fee simple title in the right of way at the Ashley crossing and vested in the St. Louis and Southeastern Railway Company, and that corporation agreed to render rent by paying the nominal sum of one dollar per year, and maintaining the crossing-frogs, and furnishing switchmen and signals. Appellant contends that this agreement is a mere license, and does not constitute a lease. The right to build a rail-

road and operate it upon the land of another is an interest in land which can only pass by grant, and an agreement to convey such a right, if not in writing, is clearly within the Statute of Frauds. (*St. Louis National Stock Yards* v. *Wiggins Ferry Co.* 112 Ill. 384.) Prior to 1869 no part of the St. Louis and Southeastern railroad had been built. After that time, and prior to 1874, its road was built across the right of way and track of appellee by its mere permission. That permission did not amount to a grant, and no title could have been acquired by occupancy prior to 1874, when the agreement above recited was entered into. By the express terms of this contract the relation of landlord and tenant was created, because it recognized the ownership of the land on the one hand and the occupation and right of possession on the other, and provided for compensation for the use of the premises. (Taylor on Landlord and Tenant, sec. 19.) We hold this agreement constituted a lease, with the Illinois Central Railroad Company as lessor and the St. Louis and Southeastern Railway Company as lessee.

It is insisted, however, that long before the filing of this bill for specific performance the lease had expired by its terms and had not been renewed. The question arises whether the covenant in this case is one running with the land. It was said in *Spencer's case,* 5 Coke, 16: "When the covenant extends to a thing *in esse,* parcel of the demise, the thing to be done by force of the covenant is, *quoad modo,* annexed and appurtenant to the thing demised, and shall go with the land, and shall bind the assignee although he be not bound by express words. * * * If the lessee for years covenants to repair the houses during the term, it shall bind all others as a thing which is appurtenant and goeth with the land in whose hands soever the term shall come, as well as those who come to it by act of law as by the act of the party, for all is one having regard with the lessor." This case is found in 1 Smith's Leading Cases, 137. The editor's notes

to *Spencer's case,* in the last named citation, on page 219, say: "Whether a covenant will or will not run with the land does not, however, so much depend on whether it is to be performed on the land itself, as on whether it tends directly or necessarily to enhance its value or render it more beneficial and convenient to those by whom it is owned or occupied, for if this be the case, every successive assignee of the land will be entitled to enforce the covenant." This language is used by this court in *Gibson* . v. *Holden,* 115 Ill. 199. The covenants of this agreement which invested the St. Louis and Southeastern Railway Company with an estate for years across the right of way of the appellee railroad company, and under which that railroad company was entitled to hold possession and covenanted to pay rent in consideration of such fact, are covenants that run with the land. *Webster* v. *Nichols,* 104 Ill. 160; *Wiggins Ferry Co.* v. *Ohio and Mississippi Railway Co.* 94 id. 83.

The question is then presented whether such covenants running with the land are applicable to incorporeal hereditaments as well as to corporeal. That is not an open question in this State. In *Sterling Hydraulic Co.* v. *Williams,* 66 Ill. 393, it was said (p. 397): "The portion of water power acquired by the deed was an easement. 'If a miller should purchase a water privilege or portion of water power without any portion of the bed of the river, he, in that case, would gain an incorporeal hereditament or easement.' (Angell on Water-courses, sec. 144.) The capacity of covenants to run with incorporeal hereditaments is the same as it is with those which are corporeal. (1 Smith's Lead. Cas.—Hare & Wall. notes, part 1,—173.) All covenants which relate to land and are for its benefit run with it, and may be enforced by each successive assignee into whose hands it may run by conveyance or assignment." In *Fitch* v. *Johnson,* 104 Ill. 111, it was said (p. 121): "While it is true the cases are not all in harmony on this subject, yet we are of opinion that by the decided

weight of authority the doctrine that covenants run with incorporeal as well as corporeal hereditaments is fully established, and where the owner of certain premises conveys a part of them, covenanting that the purchaser, his heirs and assigns, shall enjoy certain permanent rights in and with respect to the premises retained by the grantor, and also covenants in the conveyance to do and perform, from time to time, certain acts which are essential to the use and enjoyment of the purchased premises, * * * such covenant, although regarded as a burden, will be deemed to run with the servient estate, and to subject the assignee thereof to its performance."

The mortgage made by the St. Louis and Southeastern Railway Company could not convey to the mortgagee an interest greater than that possessed by the mortgagor; and a foreclosure under that mortgage did not include a greater interest than that held by the mortgagor. It is presumed that in a judicial sale the purchaser will examine the title with the same care that a person does who receives a conveyance of land, as the rule of *caveat emptor* applies to sales of this character as well as to all other judicial sales. (*Green* v. *Dodge*, 80 Ill. 564; *Bishop* v. *O'Conner*, 69 id. 431.) The mortgagor having leased the land across the right of way and constructed its railroad thereon, the purchaser under the foreclosure of the mortgage, and its grantee, the appellant here, must take notice of the rights of appellee under the above rule, as the rights of the appellee were clearly paramount to the deed of trust or mortgage.

It is objected that the Southeastern and St. Louis Railway Company is a necessary party to the suit, as both the bill and the answer state it was the owner of the railway operated by appellant, and the answer set up that no decree could be rendered in the cause without making it a party defendant to the suit. That corporation had conveyed all interest in its road to appellant for a period of forty-nine years from the time it acquired the same,

and at the time of filing the bill the lessee corporation, the appellant here, had still more than thirty years of absolute control of the easements held by the Southeastern and St. Louis Railway Company as a corporation. The lessor corporation not being in possession or control of the line of its right of way and track, is not a necessary party to this bill, for no decree against it could be made compelling it to comply with the terms of this contract, and its rights could not be materially affected by the decree under the prayer of this bill. In order to render one a necessary party to a chancery proceeding it must appear such person may be compelled to respond to the prayer of complainant's bill, and where there is nothing he is called upon to do, or can be compelled to do as a duty, he is not a necessary party. Story's Eq. Pl. sec. 76, *et seq.;* Mitfo*⌐*'.'s Eq. Pl. 162, 163.

No question can a. ise under the Statute of Frauds, as the contract in this case is in writing, and confers upon the lessee the right to occupy, use and hold the estate leased. There is an entire absence of testimony showing a right in the lessee to hold and occupy the premises leased to it, as against the lessor, by reason of any action of the lessor prior to the lessee entering into possession. When the lessee entered into possession, whether before the execution of the lease or after, by executing the lease and promising to pay rent the ownership of the lessor of the premises was recognized, and the lessee will be estopped to deny the lessor's title. The right to occupy and hold the premises during the term for which the lease was executed included the right to build and operate a railroad track thereon, and the right to build and operate a railroad track and operate it upon the land of another is an interest in land which can only pass by grant.

By the terms of the agreement a right to maintain and use the track as located at Ashley over a crossing and right of way of the party of the first part for a period of ten years from the first day of January, 1874, with

the privilege of renewal, was created. The payment of a nominal consideration, the agreement to maintain the crossing-frogs at the intersection of the two railroads in good condition, to provide the signals and switchmen necessary and required at the crossing for the safety of trains, and to save and keep harmless the appellee from the payment of all damages which might occur to the party of the second part, its trainmen, passengers and freight, by reason of any collision not arising from gross negligence of the appellee, were covenants by which a duty was to be done and performed by the lessee as a further consideration for the right to occupy and use the premises. If no right existed in the lessee to retain possession of the premises although in possession thereof, by this agreement the lessor was recognized as owner of the land, and a covenant was made between the lessee and the lessor, the appellee, to pay rent. The lessor was thus in possession at the time the mortgage was foreclosed and the sale made to the landlord of the appellant company, and for almost three years after it commenced to operate its trains on the track and right of way of its leased road the lessee's right to possession was under and by virtue of this lease. The right to cross appellee's right of way and track existed in it in no other manner. Appellee was incorporated for the purpose of building its road, and in contemplation of law it or its successors would forever maintain and operate a railroad track on the right of way it was authorized to acquire through the length of the State of Illinois, and under the law creating it it had acquired a right of way two hundred feet wide, on which its existing track was constructed and being operated. A railroad across the State in another direction could, in pursuance of the provisions of the statute, cross this right of way and track of the appellee company. The right to cross the right of way and track of appellee company could also be acquired by another road by contract. Only in the manner provided by law

or by contract could this right be acquired. The purposes for which the land was used and owned by the appellee company, and the surrounding circumstances, are all to be taken into consideration in determining the material inquiry whether a covenant runs with the land, consistent with policy and principle, for the benefit of the land. It does not depend so much on whether it is to be performed on the land itself, or whether it tends to directly or necessarily enhance its value or render it more beneficial and convenient to those by whom it is owned and occupied, for where such is the case every successive assignee of the land will be entitled to enforce the covenant. The evidence shows that the business of the appellee company has vastly increased, and that it has become material to its interest to have signals and switchmen at this crossing, and the possession of the appellant company being that of a tenant in possession under and by virtue of a lease, the terms of the contract are applicable to it and it is bound by the covenant.

The agreement provides that the lessee should provide, at its own expense, necessary switchmen and signals. On the hearing the court permitted a witness to be called who testified with reference to what was meant by "necessary signals and switchmen," and stated that what the contract "contemplates is the old gate arrangement which crossed the track, with a lamp on each at night, and a switchman there to operate these gates against the train on either road when they come to the gate, it being thrown against the railroad that has not the right to cross,—that is what the contract intended to cover when it was made." Thereupon the court asked, "Well, is that, in a general way, the character of the signals that in your opinion would be necessary at that point?" to which witness responded, "Well, I would say this: that would protect the crossing very much more than it is now. I think that if we were to put in an inter-locking, of course that would make it absolutely safe." It is urged

that this evidence was error.    The agreement providing for necessary signals and switchmen to a certain degree rendered the contract ambiguous, unless the court should take cognizance of what is meant by the terms "signals" and "switchmen." Such terms may be explained by expert evidence. We are not disposed to hold that in answering these questions there was error.

Appellant contends that in not filing its bill for specific performance until the change in the parties and in the circumstances of the ownership of the railway, which have taken place since the date of the agreement, the appellee has been guilty of *laches*.    The enforcement of the covenant with reference to maintaining such switchmen and signals as "may be necessary and required at the crossing for the safety of trains," may not have been necessary immediately after the execution of the agreement, but with the increased number of trains which the evidence shows the appellee has been running for several years before the bill was filed, and which are continuously increasing in number, in consequence of which the danger of collision has become greater, the direct performance of that covenant has become necessary for the safety of trains.    This is one of those cases where mere lapse of time, when it is not expressly made material by the agreement of the parties, is not such *laches* as will necessarily bar a decree for specific performance and preclude the granting of relief.    *Hough* v. *Coughlan*, 41 Ill. 130; *D' Wolf* v. *Pratt*, 42 id. 198; *Thompson* v. *Bruen*, 46 id. 125.

It is insisted the decree is broader than the agreement in requiring gates to be maintained at the crossing.    The language of the decree requiring switchmen and signals to be kept at the expense of appellant at such crossing is: "And said signals shall consist of a gate, with proper lamps, and to be operated by switchmen according to the manner customary at railroad crossings, for the purpose of preventing collision and otherwise enhancing safety in the joint usage of such crossing by said railroad com-

panies, and that the defendant shall continue to provide the aforesaid signals and switchmen so long as it shall maintain and operate its track over the right of way of the complainant under and by virtue of the contract, and shall also continue to maintain the crossing-frogs at said crossing during said time." Since we have held it was not error on the part of the court to have explained the meaning of the terms "signals" and "switchmen," as used in the contract, we hold the decree is not broader than the contract itself, and only includes what was meant thereby.

We are of the opinion that it was not error to decree a specific performance of the contract so long as the appellant company continued to use and operate its track across the right of way of the appellee company, it having shown no right to do so save under and by virtue of this contract.

The judgment of the circuit court of St. Clair county is affirmed.

_Judgment affirmed._