## Maggie Garrity et al., Appellees, v. Catholic Order of Foresters, Appellant.

### Gen. No. 14,516.

1.  EVIDENCE—*what competent upon the meaning of words.*  It is
competent for a witness to testify to the meaning of a term used
in his trade, profession or occupation.

2.  FRATERNAL BENEFIT SOCIETIES—*when certificate void.*  If con-
trary to the provisions of the by-laws a deceased member changes
his occupation to one of those of the prohibited class, and a conse-
quent loss of membership being made self-executory by the con-
tract of insurance, a recovery upon such certificate (the death of
the member occurring while engaged in such prohibited occupa-
tion), cannot be sustained.

3.  INSTRUCTIONS—*when as to meaning of words erroneous.*  It is
error to instruct the jury to look to the evidence for the "ordinary
and usual" meaning of words and terms; the meaning of words and
terms is a matter for the determination by the jury upon their

own knowledge, information and experience independent of evidence or instruction.

BAKER, J., dissenting.

Assumpsit. Appeal from the Superior Court of Cook county; the Hon. W. H. McSURELY, Judge, presiding. Heard in the Branch Appellate Court at the March term, 1908. Reversed. Opinion filed April 20, 1909.

EDMUND S. CUMMINGS, for appellant.

PEASE, SMIETANKA & POLKEY, for appellees.

MR. JUSTICE CHYTRAUS delivered the opinion of the court.

Appellant is one of the class of organizations known as fraternal benefit societies. Appellees, beneficiaries named in a membership or benefit certificate of appellant issued to Benjamin Garrity, their deceased brother, brought an action of assumpsit against appellant in the Superior Court of Cook county and obtained a verdict and judgment for $1,000. This appeal is from that judgment.

It appears that the Order through its court No. 291, called St. Joseph Court, on May 23, 1901, issued to Benjamin Garrity a certificate of membership whereby it promised, upon his death, to pay to Maggie and John Garrity, his sister and brother, the sum of $1,000. It is stated in the certificate that the promise is ''subject to the express conditions and stipulations'' therein set forth. Among the conditions set forth we find the following:

''4. The Constitution and By-Laws governing the Catholic Order of Foresters and the said Court at the time of the initiation into the said Court of the person to whom this certificate is issued and all amendments, additions or alterations that may be made thereto at any time during the continuance of this certificate or at any time prior to the death of said person are declared to be a part of this contract.''

At the bottom of the certificate and below the condi-

tions and stipulations aforementioned, an acceptance, signed by Benjamin Garrity, appears as follows: "I accept this certificate on the conditions hereinabove named and assent thereto, and agree to comply therewith. (Signed) BEN GARRITY, Member's signature."

After the issuance of the above mentioned membership certificate the constitution, laws, rules and regulations of the Order were amended so that the membership, previously consisting of one class, was divided into three classes, according to occupation, viz: the prohibited class, the hazardous class and the ordinary or regular class. Regarding the amendments to the by-laws of the Order it was stipulated at the time of the trial that:

"On and after January 1, 1904, the following provisions of said constitution, laws, rules and regulations became effective and were in full force and effect at the time of Garrity's death:

Sec. 213. Persons engaged in any of the following occupations shall not be eligible to regular membership in the Order: Aeronaut; anthracite coal miner; blaster in mines, tunnels and quarries; circus riders; professional acrobats, prize fighters; professional base ball or foot ball players; professional cyclists; professional outside window washers; professional divers; trapeze performers; professional chauffeur or automobile racer; railroad switchmen in yards; switchmen, except in towers, in cities of 10,000 population and upwards; railroad brakemen  *  *  *  and all other persons whom the High Court shall deem to be engaged in occupations of like hazard as those herein prohibited.

Sec. 214. Persons engaged in any of the following occupations shall be eligible to regular membership in the hazardous class only: Officers, members of crew and other employes of ocean or inland steamers, or sailing vessels, oyster dredgers; railway trainmen, namely: conductors, passenger brakemen, expressmen, baggage men, news agent, porter, mail clerks, engineers, firemen and all other employes whose occupation requires them to go upon moving trains, either freight or passenger; railway employes, namely: yard

masters, yardmen, track repairers in cities   *   *   * and all other persons whom the High Court shall deem to be engaged in occupations of like or equal hazard.

Sec. 217. Any member of the Order who changes his occupation from either the ordinary or hazardous class to the prohibited class, shall by that fact lose his membership in the Order.

Sec. 218. Persons not engaged in any of the occupations specified in Sections 213 and 214 shall be eligible to regular membership in the ordinary class, excepting those who may be considered in the hazardous or prohibited classes by the High Court."

Benjamin Garrity was killed on June 26, 1905, while coming from McCook to Gary on the Chicago & Illinois Western Railroad. At the time he was killed he was, in the course of his employment, standing on the foot board of a locomotive with which he was connected and which was used in switching operations in connection with his work. The particular locomotive had a foot board in front and one in the rear, but the evidence does not disclose upon which one decedent stood when killed. In some manner, not made clear in the evidence, he was killed by the foot board striking something while the locomotive was out on a main track passing a place where the track was being graded. The contract between appellant and Benjamin Garrity is plain and unambiguous to the effect that if, after its issuance to him, he changed his occupation and entered into any employment in which he would be engaged in the occupation, and thus hazard the risks, of a railroad switchman in a yard, meaning of course a railroad yard, he would, by that fact alone, lose his membership in the Order. By its terms the contract is made self-executing in this behalf and such self-executing provisions are valid in this state. Indeed there is no contest with reference to the meaning and validity of the contract between the parties. It seems, in a general way, to be contended by appellees that the road was small or it was a private road and there was no railroad yard connected with it, and, fur-

thermore, that decedent was not a switchman or, if he was a switchman, he was not a switchman in a yard. The disposition of the case depends upon the disposition made of these contentions. There is no conflict in the evidence. The attorneys for the appellees argue that in the "usual and ordinary meaning of the term," decedent was not a railroad switchman in a yard or yards, "but the foreman of a switching gang"; that "in the usual sense of the term" he was not employed upon a railroad but rather upon a short piece of track that "provided switching accommodations for the Dolese & Shepard Stone Company"; that he was not in the employ of a railroad but in the employ of a stone company; and, that he was not killed "in a switchyard or in consequence of a railroad switchyard."

It appears that when the certificate of membership was issued, in May, 1901, decedent was a policeman in Naperville, Illinois, but, in the summer of 1905, prior to his death, he began work on the Chicago & Illinois Western Railroad. During that year the road was in the course of construction. A portion of the road, about three or three and a half miles, lying between Gary and McCook yards, was, however, completed, so that it was operated when decedent was killed. The road had then but one locomotive and the decedent had control of the movements thereof. He was foreman switchman of a crew of two men consisting of himself and the witness John Bull. As the witness Chamberlain puts it: "He [Garrity] handled an engine, a locomotive between Gary and McCook yards." He also assisted the second switchman in coupling and uncoupling cars and in the ordinary work done by switchmen. The locomotive had an engineer and a fireman besides the two switchmen. It was employed in transferring cars with freight and empty cars back and forth between Gary and McCook and also in doing the switching in what the witnesses call the two yards. At the time in question the road had four switch tracks at Gary, none of them less than 300 feet long and any one

of them holding at least ten cars, and was connected there with the Santa Fe railroad. On these tracks crushed stone, quarry and other material which the road delivered, was sometimes stored. The road also delivered stuff for farmers. At McCook there were two tracks, each approximately one-third of a mile long, besides the main track. Other railroads connected there. The switchmen handled the empty and loaded cars, placed them upon the switch tracks and set them out on one of the tracks until they had enough cars to make up the trains. Usually the trains consisted of ten or a dozen cars. This was done at both Gary and McCook. The two tracks at McCook were connected with the main line by four switches. By the uncontradicted testimony of two witnesses, who qualified as experienced men in the operation of railroads, it is shown that a "yard," in connection with railways, consists of two or more tracks used for the purpose of assembling cars, that is, making up trains, storing cars and switching cars. One of the witnesses testified that such use of the term railroad yard is "universally and clearly known" by railroad men. The testimony of experienced railway men was competent to explain and define what was meant by the term "yard," in connection with the operation of railways, as used in the contract here involved. Their testimony did not relate to a matter of opinion but to the meaning of a term used in their trade, profession or occupation. In L. & N. R. R. Co. v. I. C. R. R. Co., 174 Ill. 448, 458-9, the Supreme Court held that such terms as "signals" and "switchmen," used in a contract, might properly be explained by experts. This uncontradicted testimony, with reference to what is meant by a railroad yard, being taken into consideration, there is, upon this record, no room for any conclusion but that decedent had changed his employment and engaged in the occupation of a railroad switchman in yards. We find no merit in the contentions that a foreman switchman, employed as was decedent, is not a

switchman; that he was not employed upon a railroad but upon a short piece of track which merely provided switching accommodations for a stone company; that he was not in the employ of a railroad but in the employ of a stone company, and that he was not killed "in a switchyard or in consequence of a railroad switchyard." There is no question in this case as to whom he was employed by, when killed, but the question is: what was his occupation? The fact that at the moment he was killed he was some three hundred feet outside of a railroad yard is likewise immaterial so long as he, by engaging in the employment which involved his performing the duties of a switchman in a railroad yard, had himself terminated the contract between himself and the Order.

The following instruction, on behalf of plaintiff, was given by the court:

"You are instructed that if you find from the evidence that the deceased, Benjamin Garrity, did not at any time prior to his death enter the occupation of railroad switchman in yards in the ordinary and usual sense and meaning of that term, as shown by the evidence, if it is so shown, then you should find for the plaintiff herein."

The giving of that instruction was error. There was not, and could not properly be, any evidence introduced as to "the ordinary and usual sense and meaning" of the term railroad switchman in yards. The "ordinary and usual" sense and meaning of words and terms is not a proper subject matter of evidence or instruction; but a matter for determination by the jury upon their own knowledge, information and experience, independent of evidence or instruction. Law suits are not tried upon the idea or theory that the jurors need evidence as to the ordinary and usual sense or meaning of words or terms. The evidence relating to the meaning of the term railroad yard was not admitted upon the theory that the witnesses upon the subject would testify to the "ordinary and usual" sense and meaning thereof but upon the theory that

the term "yard" had a particular and specific meaning when used in connection with a particular trade or calling, namely, the operation of railroads. This instruction had a tendency to mislead the jurors, that is, to suggest to their minds that, notwithstanding the evidence in this behalf, the term in question had an ordinary and usual sense and meaning which they, the jurors, might adopt and follow. The suggestion of the instruction is inconsistent with the ruling of the learned trial judge upon the competency and admissibility of the evidence, properly admitted, as to the meaning and definition of the term "yard" in connection with the operation of railroads. In the view taken by us of the case this may not be very material, but it explains the verdict and we desire it to be understood that we disapprove of the instruction.

For the reasons indicated the judgment of the Circuit Court will be reversed and the case will not be remanded.

*Reversed.*

Mr. Justice BAKER dissenting.

The by-law of the defendant society does not declare that no railroad switchman shall be eligible to membership. It excludes: "Railroad switchmen in yards; switchmen, except in towers, in cities of 10,000 population and upwards." Yard switchmen are excluded. All switchmen in towns of more than 10,000 population are excluded except those employed in towers. Ordinary switchmen in towns of 10,000 population or less are eligible to membership. Gary is a town of less than 10,000 population.

The road of the company by which Garrity was employed was in process of construction. The company had only three and a half miles of road in operation; only one locomotive. At Gary were four spur or side tracks leading to bins of the Dolese & Shepard Company, from which various kinds of stone were loaded into cars which were then taken to McCook by the crew

to which Garrity belonged. That crew handled some days fifteen or twenty cars, some days ten, some days none.

The words, "Railroad switchmen in yards," as used in the by-law, I think mean switchmen regularly employed in railroad yards, as distinguished from ordinary switchmen who work both in and out of railroad yards, and I think that on the evidence, Garrity was an ordinary switchman and was not one of the class of men called "in the by-law as 'railroad switchmen in yards'."