# Illinois Official Reports

## Appellate Court

---

*In re Estate of Holms*, 2019 IL App (2d) 190139

---

| | |
|---|---|
| Appellate Court Caption | *In re* ESTATE OF CATHERINE A. HOLMS, Deceased (James Holms, Petitioner and Counterrespondent-Appellee, v. Tracy Batdorf, Respondent and Counterpetitioner-Appellant). |
| District & No. | Second District<br>No. 2-19-0139 |
| Filed | December 23, 2019 |
| Decision Under Review | Appeal from the Circuit Court of Lake County, No. 18-P-920; the Hon. Michael J. Fusz, Judge, presiding. |
| Judgment | Reversed and remanded. |
| Counsel on Appeal | Marshal P. Morris, of Marshal P. Morris, LLC, of Buffalo Grove, for appellant.<br><br>Anna E. Finn Vinson and Amy Lynn Lonergan, of Finn & Finn, Ltd., of Waukegan, for appellee. |
| Panel | JUSTICE SCHOSTOK delivered the judgment of the court, with opinion.<br>Presiding Justice Birkett and Justice Burke concurred in the judgment and opinion. |

**OPINION**

¶ 1     Catherine Holms, the decedent, entered a property settlement agreement (PSA) as part of a legal separation from the petitioner, her surviving husband James Holms. Upon her death, James filed a petition for probate of her estate, letters of administration, and an affidavit of heirship listing himself as a spouse and heir. The respondent, Tracy Batdorf, the decedent's daughter, filed a counterpetition arguing that, pursuant to the PSA, James was not an heir of the decedent's estate. Following a hearing, the trial court found that James was a spouse and heir of the decedent's estate. Tracy appeals from that order. We reverse and remand for additional proceedings.

¶ 2                               BACKGROUND

¶ 3     The decedent and James were married on January 17, 2014. No children were adopted or born to the decedent and James during the marriage. The decedent had two children from a prior marriage, Tracy and Scott Batdorf.

¶ 4     On January 20, 2017, a judgment for legal separation was entered. At that time, the decedent was 61 years old and suffered from a debilitating medical condition. James was 62 years of age and still employed. The judgment incorporated a PSA. The judgment stated that (1) the PSA was "final and non-modifiable," (2) the parties would carry out the terms and conditions of the PSA, and (3) the parties would "establish of record the sole and separate ownership of the property of said parties in the manner therein agreed and provided."

¶ 5     The PSA stated that the parties made the PSA "in light of the facts that are stated below," which included paragraphs A through P. Paragraph H stated as follows:

> "H. Without any collusion as to said proceeding, the parties hereto consider it to be in their best interests to settle between themselves the issues arising out of said litigation including, but not limited to, maintenance, the allocation of marital property, debts, attorney's fees, and to forever, finally and fully settle and adjust between themselves the other rights growing out of the marital or any other relationship now or previously existing between them and to fully and finally settle any and all rights of every kind, nature and the other, including all rights and claims in and to any property of the other, of every kind, nature and description, whether real, personal, marital, non-marital, or mixed, now owned or which may hereafter be acquired by either of them."

¶ 6     The PSA also provided that the parties were waiving maintenance as to each other and that the decedent's right to receive maintenance was "satisfied by the cash settlement as set forth in Article VII" of the PSA. Article VII provided that James was to pay the decedent a lump sum of $180,000 for settlement of the decedent's interest in the marital home and her waiver of maintenance. Pursuant to the PSA, the decedent was to quitclaim to James her interest in the marital home, which would then become James's "sole and exclusive property." The PSA provided that the parties received their own bank accounts and vehicles as their sole and exclusive property and were responsible for their own debts and liabilities.

¶ 7     The final provision of the PSA included a release of claims, as follows:

> "11.1 Release of Claims. The parties mutually release and forever discharge each other from all actions, suits, debts, claims, and obligations, including claims against each

other's property, with regard to any matter that has occurred prior to the date of the execution of this [PSA] with the exception of the following:

A. Any cause of action for dissolution of marriage or legal separation.

B. Enforcement of the provisions of any judgment of dissolution of marriage or legal separation.

C. Enforcement of the provisions of this [PSA].

The parties intend that henceforth there shall exist between them only those rights and obligations specifically provided for in this [PSA] or in any judgment for dissolution of marriage or legal separation.

The parties agree that neither party will at any time sue the other party, or his or her heirs, representatives, or assigns to enforce any right relinquished under this [PSA].

11.2 Other Parties Bound. This [PSA] binds not only the parties, but also their heirs, executors, administrators, legal representatives, and assigns. In addition, this [PSA] shall inure to the benefit of the parties' heirs, executors, administrators, legal representatives, and assigns."

¶ 8 At the hearing on the judgment for legal separation, the trial court asked James if he understood the finality of the PSA:

"THE COURT: Parties have entered into a voluntary [PSA] which intends to for this time and forever forward settle all matters of property owned by the parties today. So I want everybody to understand even at the time of the divorce that the property matters have been adjudicated. [The decedent,] do you understand that?

[THE DECEDENT]: Yes.

THE COURT: Do you understand?

[JAMES]: Yes."

¶ 9 In accord with the terms of the PSA and judgment for legal separation, the decedent quitclaimed her interest in the marital property to James and James paid the decedent $180,000.

¶ 10 On February 14, 2017, the decedent purchased a home in Volo for $116,000. The decedent took sole title to the property. On May 28, 2018, the decedent died at the age of 63 without a will. Tracy had lived at the Volo home with the decedent, and she continued to reside there after the decedent's death.

¶ 11 On October 9, 2018, James filed a petition for probate of the decedent's estate. Along with the petition, James filed an affidavit of heirship and a petition for letters of administration of the estate, listing himself as the decedent's spouse and heir. On October 19, 2018, Tracy filed a counterpetition for letters of administration, her own affidavit of heirship, and a petition for supervised administration. Her affidavit of heirship stated that James had waived his inheritance rights under the PSA and thus was not an heir. In her petition for supervised administration, Tracy requested that, if James were appointed as the administrator of the estate, the court supervise the distribution of assets. On October 22, 2018, Joseph Balmes was appointed as independent administrator of the estate.

¶ 12 On November 16, 2018, James filed a response to Tracy's petition for supervised administration. James noted Tracy's assertion that, under the PSA, he waived his statutory right of inheritance and was no longer an heir of the decedent. He noted that he and Tracy agreed that the primary asset of the decedent's estate was the real property owned by the

decedent at the time of her death. James argued that it was not possible for any separation agreement to remove the legal rights of heirship and that, even if it were possible, it would require very specific and explicit language to that effect. He noted that the PSA did not contain a single provision specifically addressing rights of heirship.

¶ 13    James also noted that the release of claims in the PSA, section 11.1, was limited to "any matter that ha[d] occurred prior to the date of the execution" of the PSA. He argued that, since the decedent's real property was purchased after the execution of the PSA, the real property was not within the purview of the release of claims. James acknowledged paragraph H of the PSA, which indicated that the PSA was a final settlement of all claims of every nature between the parties. However, he argued that paragraph H was essentially a "whereas" clause and did not create any rights beyond what was contained within the operative terms of the PSA, which did not address a waiver of any inheritance rights.

¶ 14    On December 21, 2018, Tracy filed a reply. Tracy argued that, by the terms of the PSA and judgment for legal separation, James waived his inheritance rights. She noted that paragraph H of the PSA stated that the parties "fully" settled "all rights of every kind, nature and description, whether real, personal, marital, non-marital, or mixed, now owned or which may hereafter be acquired." Tracy argued that, under the PSA and judgment for legal separation, the decedent and James had adjudicated all of their marital and nonmarital property rights. Further, the PSA gave Tracy the right to enforce the PSA. Tracy noted that, if the decedent had merely put the $180,000 in a bank account, James would not have the right to seek the return of the money. The fact that the decedent purchased a home should not change that result.

¶ 15    On January 14, 2019, a hearing was held. A court reporter was not present, and there is no transcript of that hearing. However, on February 14, 2019, the trial court issued a written opinion, finding that James was a spouse and heir of the decedent's estate. The trial court noted that Tracy and James agreed that the decedent's home was titled in her name alone and that she had purchased the home with the cash settlement from the PSA. The trial court found that there were no words in the PSA that referenced the possibility of death or that clearly indicated the intent to surrender or waive a statutory spousal award. Thus, it determined that James was a spouse and heir of the decedent and was not barred from asserting any rights he might have as a surviving spouse. The trial court retained Balmes as the independent administrator of the decedent's estate. Tracy filed a timely notice of appeal from this order.

¶ 16                                        ANALYSIS

¶ 17    On appeal, Tracy argues that the trial court erred in finding that James was not barred from asserting that he was a surviving spouse and heir of the decedent's estate. She argues that, based on the judgment for legal separation, the PSA, and the transcript from the hearing on the judgment for legal separation, the decedent and James clearly intended to waive their statutory inheritance rights.

¶ 18    The ordinary rules for the construction of contracts apply to the interpretation of a marital settlement agreement. *In re Marriage of Frank*, 2015 IL App (3d) 140292, ¶ 11. A judgment of dissolution and a marital settlement agreement are to be construed as a single agreement. *Id.* In the present case, there is no reason why the same principle would not apply to a judgment for legal separation and a PSA.

¶ 19    When interpreting a PSA, courts seek to give effect to the parties' intent. *In re Marriage of Dundas*, 355 Ill. App. 3d 423, 425-26 (2005). When the terms of an agreement are

- 4 -

unambiguous, intent must be determined solely from the agreement's language. *In re Marriage of Hall*, 404 Ill. App. 3d 160, 166 (2010). When an agreement is ambiguous, the court may hear parol evidence to decide the parties' intent. *Dundas*, 355 Ill. App. 3d at 426. An ambiguity exists where the language of an agreement is susceptible to more than one reasonable interpretation. *Allton v. Hintzsche*, 373 Ill. App. 3d 708, 711 (2007). All the provisions of an agreement should be read as a whole to interpret it and to determine whether an ambiguity exists. *Rich v. Principal Life Insurance Co.*, 226 Ill. 2d 359, 371 (2007). An ambiguity is not created simply because the parties disagree on the meaning of any provision. *Id.* at 371-72. We review *de novo* a trial court's interpretation of a marital settlement agreement or, as in this case, a PSA. *Dundas*, 355 Ill. App. 3d at 426.

¶ 20 In the present case, the language of the judgment for legal separation and the PSA is susceptible to only one reasonable interpretation. Those documents indicate that the parties intended to waive all interest in each other's property, including any spousal inheritance rights. The judgment for legal separation indicates that the PSA was final and nonmodifiable and was for the purpose of establishing the sole and separate ownership of property. In the PSA, paragraph 3.2 stated that, once the decedent quitclaimed the marital home to James, the property would become James's "sole and exclusive property." In paragraph 7.1, in return for releasing her rights to the marital home and waiving maintenance, James was to pay the decedent $180,000. Article IV of the PSA stated that the decedent's and James's bank and retirement accounts would become their "sole and exclusive property." Also under the PSA, the decedent and James were to retain their clothes, personal items, and cars as their "sole and exclusive property."

¶ 21 Further, in article XI, the decedent and James specifically agreed that they were mutually releasing each other from any claims, "including claims against each other's property." There were only three exceptions listed: causes of action for dissolution of marriage or legal separation, enforcement of any such judgments, and enforcement of the PSA. They also agreed that, going forward, they would have only those rights and obligations specifically provided for in the PSA and that "neither party [would] at any time sue the other party, or his or her heirs *** to enforce any right relinquished under [the PSA]." As stated, the only rights each retained were the three exceptions set forth above.

¶ 22 Finally, other language in the PSA demonstrates that the parties were finally settling all their property rights arising as a result of the marriage. Paragraph H of the PSA specifically stated that the parties entered the PSA to "finally settle any and all rights of every kind *** including all rights and claims in and to any property of the other *** now owned or which may hereafter be acquired by either of them." It is well settled "that a husband and wife may make a valid separation agreement by which one or each of them releases all his [or her] rights in the other's property, including inchoate rights of inheritance and dower." *Laleman v. Crombez*, 6 Ill. 2d 194, 196 (1955).

¶ 23 We acknowledge that the PSA also indicated that the release operated "with regard to any matter that has occurred prior to the date of the execution" of the PSA. James argues that such language indicates that the decedent's subsequent purchase of her home was not within the purview of the release. We disagree. The purpose of such language was to ensure that the PSA applied to all the marital property and rights that were held when the PSA was entered. It was not intended to make the release inapplicable to any property acquired after the PSA was executed, as the decedent and James specifically relinquished any such property rights in the

PSA. Although we interpret the PSA according to its plain language, we note that our interpretation is bolstered by James's testimony at the hearing for legal separation. At that hearing, James acknowledged that the PSA was intended to forever and finally settle all matters of property owned by the parties.

¶ 24    In reaching a different result, the trial court relied on *In re Estate of Brosseau*, 176 Ill. App. 3d 450 (1988), and *In re Estate of Cullen*, 66 Ill. App. 2d 217 (1965). In *Brosseau*, the trial court determined that a postnuptial agreement barred the surviving husband from renouncing his wife's will and from receiving a statutory surviving spouse's award. *Brosseau*, 176 Ill. App. 3d at 452. The postnuptial agreement provided that the husband and the wife would make no claim upon the other's property at the other's death and, further, that " '[a]fter the death of either it shall be free from the claim by the other on account of dower, courtesy or other statutory right in the same manner as if the said marriage had never been celebrated.' " *Id.* In affirming, the reviewing court noted that, while the agreement did not specifically use the words " 'surviving spouse's award,' " the language that barred claims based on " 'dower, courtesy, or other statutory right' " was sufficient to bar a surviving spouse's award. *Id.* at 455.

¶ 25    In *Cullen*, the issue was whether a premarital agreement barred the wife from seeking a surviving spouse's award. *Cullen*, 66 Ill. App. 2d at 220. The premarital agreement provided that the wife " 'expressly agrees that in case she shall survive [husband], she will make no claim to any part of his estate as surviving widow.' " *Id.* at 218. It further provided that all of the husband's property would " 'at his death, descend to his heirs at law (exclusive of [wife]), legatees or devisees as though said marriage had not taken place.' " *Id.* at 219. The husband died and his will referenced the premarital agreement and noted that each party had waived any rights in the other's estate. *Id.* The reviewing court affirmed the trial court's determination that the language of the premarital agreement was sufficient to bar a surviving spouse's award. *Id.* at 226. In so ruling, the reviewing court noted that specific language was not necessary to bar a claim for a spousal award. Rather, as long as the language of the agreement demonstrated that the parties intended to bar a surviving spouse's award, this was sufficient. *Id.*

¶ 26    In relying on these two cases, the trial court found that, unlike in *Cullen* and *Brosseau*, there was no specific language in the PSA alluding to either party's death or clearly indicating the intent to surrender or waive any statutory inheritance rights. We disagree with the trial court's interpretation of the PSA. We hold that paragraph H, the division of property to the decedent and James as "their sole and exclusive property," and section 11.1 regarding the release of claims were sufficient to demonstrate the intent to waive a statutory spouse's award. The *Cullen* court pointed out that no specific language was necessary to bar a claim for a spousal award. *Id.* Here, the PSA was clearly a final settlement of all property issues between the parties as a result of their marriage. While such an agreement is not necessary for a legal separation, the court may approve such an agreement if requested by the parties. See 750 ILCS 5/402 (West 2016).

¶ 27    James argues that paragraph H is essentially a "whereas" clause and should not be considered an operative term of the contract. We acknowledge that, while "whereas" clauses may shed light on the purposes and motives of the contracting parties, they cannot create any right beyond those arising from the operative terms of the agreement. *Aramony v. United Way of America*, 254 F.3d 403, 413 (2d Cir. 2001). Even so, our reliance on paragraph H is not improper. The language of the PSA, dividing property as the sole and exclusive property of the decedent and James, and the language of the release demonstrate that the parties intended

the PSA to be a final settlement of all property claims between them as a result of their marriage. Paragraph H bolsters this interpretation, and we do not rely on it to create any right that is not set forth in the operative terms of the PSA.

¶ 28  Finally, James argues that the PSA was intended to settle the property rights between the parties as of when the PSA was executed but not any rights as to property acquired after the execution of the PSA. In support, he notes that, at the hearing on the legal separation, the trial court specifically stated that the PSA settled "all matters of property owned by the parties *today*." (Emphasis added.) However, the trial court further stated that it wanted "everybody to understand even at the time of the divorce that the property matters have been adjudicated." Accordingly, when read in context, the trial court was explaining that the decedent and James were reaching a final settlement as to all property rights as a result of the marriage. The word "today" conveyed that the PSA would be a final adjudication of all property rights, even if or when a judgment for dissolution were later entered. There was no indication that future property rights would be at issue at the time of a judgment for dissolution.

¶ 29                                    CONCLUSION
¶ 30  For the foregoing reasons, the trial court erred in finding that James was an heir of the decedent's estate. The judgment of the circuit court of Lake County is reversed, and the case is remanded for additional proceedings.

¶ 31  Reversed and remanded.