**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2024 IL App (3d) 230114-U

Order filed May 1, 2024

_____

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2024

| | | |
|---|---|---|
| TOM LOGUE a/k/a THOMAS LOGUE, Jr., | ) | Appeal from the Circuit Court |
| | ) | of the 18th Judicial Circuit, |
| Plaintiff-Appellant, | ) | Du Page County, Illinois, |
| | ) | |
| v. | ) | Appeal No. 3-23-0114 |
| | ) | Circuit No. 18-L-48 |
| | ) | |
| CLINE FINANCIAL CONCEPTS, LLC, an | ) | |
| Illinois Liability Company and SCOTT CLINE, | ) | |
| Defendants, | ) | |
| | ) | |
| (Cline Financial Concepts, LLC, | ) | Honorable |
| | ) | David E. Schwartz, |
| Defendant-Appellant.) | ) | Judge, Presiding. |

_____

JUSTICE BRENNAN delivered the judgment of the court.
Presiding Justice McDade and Justice Peterson concurred in the judgment.

_____

**ORDER**

¶ 1    *Held*:   In determining the damages for breach of an agreement for sale of a financial services business, the trial court did not err in: (1) awarding damages for actual, as opposed to anticipated, client retention rate and corresponding fees earned following the sale, or (2) declining to award statutory prejudgment interest. However, the manner in which the court chose to reduce damages in light of plaintiff's conduct was not supported by the evidence. Affirmed as modified.

¶ 2    Plaintiff, Tom Logue, filed a complaint for breach of contract against defendants, Scott Cline and Cline Financial Concepts, LLC (collectively Cline), concerning the sale of Logue's financial services business to Cline. Cline asserted affirmative defenses of fraudulent inducement, prior material breach of contract, and accord and satisfaction. Cline also filed counterclaims for common law fraud and contingent breach of contract (should the court find that the parties did not mutually terminate the agreement). Following a bench trial, the court entered judgment in favor of Logue and against Cline. The court awarded Logue $167,702 in damages, representing Logue's share of actual fees earned following the execution of the sales agreement as well as a reduction in those fees due to Logue's own conduct. The court declined to award statutory prejudgment interest pursuant to section 2 of the Interest Act (Act) (815 ILCS 205/2 (West 2022)). Logue appeals, challenging damages only. We affirm as modified.

¶ 3                                    I. BACKGROUND

¶ 4    Logue was the sole proprietor of Logue Financial Planning. In the Spring of 2017, Logue sought to sell his book of business which, after 27 years, consisted of just over 100 clients and 150 accounts (with some clients having both investment and retirement accounts). The total assets under management was approximately $23 million.

¶ 5    Scott Cline was the sole proprietor of Cline Financial Services. Cline was looking to grow his financial planning business by purchasing another. Cline and Logue connected on a website called Succession Link. Logue informed Cline that his clients were primarily older, retired persons conservatively invested in bonds. This suited Cline, and the two began to work toward an agreement. In early June 2017, Logue informed Cline that he had sold the vast majority of his clients' bonds. Logue explained that, this way, Cline would be able to transfer cash accounts to his management.

2

¶ 6    On June 16, 2017, the parties executed a "Buy-Sell Agreement" (agreement). The agreement provided that Cline would charge a 1.5% annual management fee for any of Logue's former accounts that Cline was able to secure. Logue's former accounts were set forth in amendment 2 of the agreement. Of those 1.5% fees, Cline would pay Logue a 70% share for a term of four years. Payments were due quarterly, and the agreement set forth a penalty clause for late payment: "[Cline] agrees to pay an additional 0.5% penalty on top of the 70% set forth in this agreement for any quarterly payments found delinquent of payment."

¶ 7    The agreement also addressed client retention, control, recruitment, and solicitation:

"Retention Rate: If any Existing Client that has transferred from [Logue] decides to terminate his or her contract for any reason, then [Logue] will not receive any additional payments for this or these accounts that have terminated.

\*\*\*

Existing Client Control: [Logue] relinquishes all control of Existing Clients \*\*\*. However, [Logue] is required [to] provide additional retention support as needed throughout the purchase period if called upon.

\*\*\*

New Clients: all new clients that [Cline] acquires during this purchase are not deemed to be a part of this agreement \*\*\* [but] any referrals from [Logue] to [Cline] will be included in this agreement during the payout period of the contract. \*\*\*.

Client Solicitation: by signing this agreement, [Logue] agrees to no longer attempt to solicit new clients for financial planning, nor solicit Existing Clients \*\*\* away from [Cline]."

¶ 8    Soon after the agreement was signed, Cline learned that Logue's clients' investments had been concentrated almost exclusively in inverse floating-rate collateralized mortgage obligations,

referred to by the parties throughout as inverse floater bonds. Cline did not consider inverse floater bonds to be a conservative investment. In Cline's view, Logue misrepresented the nature of his former clients' investment history. Cline also learned that Logue attempted to sell life insurance policies and/or annuities to five of his former clients. Cline hired an attorney, sent two letters advising Logue to end his solicitation, and, in a third letter, informed Logue that he considered the agreement terminated. The date of this third letter roughly coincided with the due date for the first quarterly payment. As such, Cline enclosed a check for $11,884, representing the first quarterly payment due under the agreement. Cline wrote in the check's memo line, "agreement ending amount." Cline proceeded to manage the accounts he had secured through that date. Cline returned the files of the clients he had not secured.

¶ 9  In January 2018, when Cline did not make the second quarterly payment, Logue filed the instant breach-of-contract lawsuit (later amended). In Logue's view, Cline breached the agreement by failing to make the second quarterly payment. Logue disagreed that his attempt to sell life insurance and/or annuities to former clients violated the agreement's solicitation provision and disagreed that inverse floater bonds were inappropriate for conservative investors. Cline asserted affirmative defenses of fraudulent inducement, prior material breach of contract, and accord and satisfaction. Cline also filed counterclaims of common law fraud and contingent breach of contract.

¶ 10             A. Trial

¶ 11  In June 2022, the case proceeded to a bench trial. Cline, Logue, and three of Logue's former clients testified (Dale C., Christine P., and Suzanne C.).

¶ 12  Cline testified that Logue reached out to him on April 25, 2017, on a platform called Succession Link. Cline, then age 45, was looking to expand his own financial planning business

by purchasing another. Cline was looking for a business that managed low-risk investments. Logue represented to Cline that his clients were primarily retirees and were primarily invested in low-risk, Triple AAA rated bonds. Logue also represented that the assets under management totaled $23 to $25 million.

¶ 13  Logue did not disclose that, in early June or just prior, Logue had received regulatory inquiries from the Financial Industry Regulatory Authority (FINRA) and the Illinois Securities Department (ISD). Rather, Logue affirmatively represented to Cline that ISD informed him he would *not* be audited because he was selling his business. Logue also failed to disclose that his clients had been invested in inverse floater bonds, which Cline considered to be high risk. If Cline had known of the regulatory inquiries and the investment and sale of the high-risk bonds, he would not have entered into the agreement. Cline agreed on cross-examination, however, that had he added up the account values of the 100-plus clients listed in amendment 2 of the agreement, the total would have been approximately $20 million, reflecting the loss on the June 2017 sale of the high-risk bonds.

¶ 14  On August 17, 2017, Cline e-mailed Logue a report showing the number of Logue's former clients who had signed with him thus far. Of the approximately 150 former client accounts, 38 had signed with Cline; 18 had indicated they would not sign with Cline; and 94 were undetermined. Cline agreed that in a prior purchase of a different financial business, he had ultimately attained a 75% retention rate. Cline also agreed that he had previously communicated to Logue that a 75% retention rate was feasible. (A June 13, 2017, e-mail from Cline to Logue explained that a 1.5% fee for the current assets under management over the term of the agreement would result in a $925,000 payment to Logue, which, assuming a 75% retention rate, would be reduced to $693,750 to Logue.)

5

¶ 15 Cline was unable to retain John B. John B. informed Cline that he was moving to California and would choose a local advisor. Cline told John B. that he had several out-of-state clients, but John B. was not interested.

¶ 16 Several of the clients who signed up with Cline ended up terminating their relationship with Cline, such as Leonor H., Janet P., Mary Ann S., Jody S., and Christine P. (who would nevertheless testify on Cline's behalf).

¶ 17 Cline contacted each of Logue's former clients, if only to leave a voicemail. However, as his relationship with Logue deteriorated in September 2017, Cline did not follow up on many of those voicemails.

¶ 18 Cline testified that Logue attempted to sell life insurance policies to five former clients after he had signed the agreement. In Cline's view, this violated the solicitation provision of the agreement which provided that: "[Logue] agrees to no longer attempt to solicit new clients for financial planning, nor solicit Existing Clients *** away from [Cline]." A life insurance policy is a financial planning product. To Cline, it was irrelevant that Cline himself was not licensed to sell life insurance. Cline believed that Logue's efforts to sell life insurance policies to his former clients took away from his duty to aid Cline in transferring clients to Cline and took away from the assets that the clients would have available to invest with Cline. For example, Cline, Logue, and client Doug K. met for one hour with the purpose of discussing transferring Doug K.'s accounts to Cline's management. However, Logue spent 53 minutes trying to sell Doug K. life insurance and only 7 minutes informing Doug K. of the transfer opportunity. Also, client Jo Marie K. called Cline in October of 2017 and informed Cline that she had decided not to purchase an annuity contract from Logue and therefore would have additional funds to place under Cline's management.

¶ 19    Cline addressed Logue's accusation that Cline disparaged Logue to the former clients by telling them that Logue had used religion to further his business. Cline testified that he was present on four different occasions when Logue told clients, including John B., that, after speaking with family and his priest, he thought the timing had been right to sell the inverse floater bonds.

¶ 20    Regarding the breakdown of Logue and Cline's professional relationship, Cline testified that, on September 21, 2017, his attorney drafted Logue a letter informing Logue that Cline believed Logue to have breached the solicitation provision of the agreement by maintaining his website such that it appeared that his business was active and by attempting to sell life insurance policies to his former clients. Cline and Logue discussed the matter on September 25, 2017. According to Cline, Logue told Cline to continue paying him, or it would be "very bad" for Cline. Cline took this as a threat. On September 28, 2017, Cline's attorney sent another, similar letter to Logue. Cline also asked Logue to correct the alleged breach by October 15, 2017, or he would consider the agreement terminated. On October 13, 2017, Cline's attorney sent a third and final letter. In it, Cline asserted that the agreement was terminated as of October 15, 2017, due to Logue's breach of the solicitation provision. Cline enclosed a $11,884 check, representing 70% of the fees earned in the first quarter. The check contained the notation "agreement ending amount." Logue deposited the check. In Cline's mind, this formalized the termination of the agreement.

¶ 21    Cline stopped contacting Logue's former clients by September 28, 2017, at his attorney's direction. Therefore, Cline did not contact Logue's former client, Mike S., when, on October 11, 2017, Logue informed Cline that Mike S. would be waiting for his call and was interested in setting up a nonqualified dividend plan. Although Cline stopped contacting Logue's former clients by September 28, 2017, he retained the clients he had already signed. The one exception was Logue's

7

father, whom Cline chose to cease working with as a client. In October 2017, Cline returned to Logue the files of the clients he had not retained.

¶ 22    Regarding his position on damages, Cline testified that he was owed $21,000 (140 hours at $150 per hour) for his time spent addressing FINRA and ISD inquiries regarding the high-risk bonds and addressing his clients' questions regarding the same. Additionally, Cline sought $141,000, for the additional fees he anticipated that he would have earned had Logue, in fact, sold his former clients only conservative investments as represented and thereby enabled Cline to recruit from a more satisfied clientele base.

¶ 23    Logue testified consistent with Cline as to the timing of events. On cross-examination, he addressed inverse floater bonds. There, the trial court admitted, over Logue's objection, Cline's exhibit No. 6, a written settlement between American Independent Securities Group, LLC (AISG) (the brokerage agency with whom Logue worked to buy and sell his clients' inverse floater bonds) and FINRA concerning 44 of Logue's former clients. The court acknowledged that exhibit No. 6 concerned a settlement between non-parties and did not refer to Logue by name. It explained, however, that Logue's objections went to weight rather than admissibility and noted that it was conducting a bench as opposed to a jury trial. (Logue does not challenge the admissibility of exhibit No. 6 on appeal.)

¶ 24    The written settlement documented that AISG accepted, without admitting, the following findings by FINRA. From October 2014 to April 2017, AISG (through its agents) failed to maintain procedures to supervise "Representative A's" sale of inverse floating rate collateralized mortgage obligations and respond to red flags that Representative A's sales were unsuitable for his customer base. FINRA explained the mechanics of "inverse floaters" and noted that they were "among the most thinly traded and volatile types of CMO's." They were not easily liquidated.

8

Further, inverse floaters were suitable "only" for sophisticated investors with high-risk tolerances. However, Representative A's customers were "predominantly older and retired." A "majority" of the customer accounts were retirement accounts. "Nearly all" of the customers identified their account objective as "preserving principal and generating current income." "Most" of the customers specified a "moderate" risk tolerance, and the remainder specified a "low" or "minimal" risk tolerance. "None" of the customers specified a "high" risk tolerance. Moreover, "many" of the customers had "limited" income and net worth. By the end of 2014, Representative A had 148 customer accounts holding inverse floaters and cash, totaling over $20 million. Representative A's customer accounts were "entirely concentrated" in inverse floaters. Representative A's customers purchased the inverse floaters at the same time as one another. These purchases occurred over 1,100 transactions that totaled more than $17 million. In May and June of 2017, Representative A sold most of his customers' inverse floater investments, resulting in "realized losses in excess of $2 million." AISG paid $275,000 in restitution to 44 of the customers, with the average award being $6250.

¶ 25    Logue testified to facts establishing that he was "Representative A," though he declined to expressly admit it. ("Q. [The settlement] reads 'Representative A is the only AISG representative selling CMO's.' Do you see that? A. Yes, I do. Q. And you were a representative of AISG? A. That is correct. Q. And you sold CMO's? A. That is correct. Q. Representative A in this document refers to you, correct? A. I don't know because I've never read the entire document.")

¶ 26    Further, over the course of his testimony, Logue confirmed several of the findings set forth in the written settlement. Logue testified that the majority of his customers were older, retired, unsophisticated investors. He estimated that, prior to the June 2017 liquidation, 95% of the

customer accounts were concentrated in inverse floater bonds. With the exception of three accounts, Logue liquidated the entirety of the inverse floater investments.

¶ 27        Logue disagreed, however, that inverse floater bonds were risky: "[They] are backed by the full faith and credit of the United States Government." Further, Logue testified that he informed his clients "in detail" of the nature of inverse floaters before purchasing them.

¶ 28        Logue described the process of purchasing inverse floaters for his clients through AISG. Logue testified that he bought bonds for his clients through his broker, AISG. Inverse floater bonds were sold on the secondary market. Logue bought approximately $1 million in bonds at a time, and then he allocated them to his clients. Each client had to purchase or sell at least 100 bonds, or none. "So if one guy wants to sell 17 bonds, he can't sell them because it's not *** eligible. You have to have 100."

¶ 29        In May and June of 2017, Logue informed his clients that he was liquidating their bonds due to rising interest rates, which inversely affected the value of the bonds. All but three clients, including Dale C. and Ernest W., agreed to sell the bonds. The majority of the clients who sold their bonds experienced a financial loss. Logue testified equivocally on the question of realized loss. First, he stated that the average customer lost 10 percent of their bond value as compared to "when we started out." Then, he stated that the customers merely "gave back some of their gains. Only a handful of people lost money[.]"

¶ 30        Logue agreed that he received the following commissions through the purchase and sale of inverse floater bonds: $195,000 in 2015; $245,000 in 2016; and $362,000 in 2017 (which included the final sell-off). Logue disagreed that he liquidated his clients' inverse floaters just prior to the sale of his company for the purpose of receiving a commission on those sales but he acknowledged: "I certainly was compensated for it."

10

¶ 31        Elsewhere, Logue testified that he liquidated the bonds because it would be easier for Cline to assume management over client accounts that were in cash. Logue informed Cline that he would be selling his clients' bonds before selling the book of business. Cline "didn't say much. *** [H]e's not a big bonds guy."

¶ 32        Logue agreed to help Cline recruit his former clients. Logue and Cline traveled together to some of the former clients' homes. Logue agreed that, during these meetings, he also attempted, albeit unsuccessfully, to sell life insurance and/or annuities to five former clients. He did not believe this to be a breach of the solicitation clause of the agreement, because Cline did not intend to sell those products to the clients. Moreover, he believed that he and Cline had an oral agreement to except the sale of such products from the solicitation provision.

¶ 33        Logue testified to his view of the end of the parties' professional relationship. On September 21, 2017, Cline's attorney sent the letter addressing Logue's alleged breach of the solicitation clause. Logue contacted Cline, and he believed that they resolved the matter via discussion. However, on September 28, 2017, Cline's counsel sent another, similar letter. On October 13, 2017, Cline's attorney sent a letter stating that they considered the contract terminated. They enclosed a check in payment for the first quarter. The check provided in the memo line: "agreement ending amount." Logue saw the memo but did not pay attention to it and deposited the check. When Cline did not make the second quarterly payment, due in January 2018, Logue filed the instant lawsuit.

¶ 34        Around the same time, on October 8, 2017, Cline sent Logue a letter informing him that the ISD was performing an investigation and had requested the files of six of Logue's former clients, including Mike S., John B., and Ernest W. Logue did not believe that Mike S. or Ernest W. had ever filed a complaint against him.

11

¶ 35    To the contrary, on October 11, 2017, Logue informed Cline that Mike S. was looking to invest in nonqualified dividends. According to Logue, Mike S. was an emergency room doctor, who had $7 million to invest. Instead of calling Mike S., Cline returned the client files to Logue.

¶ 36    As to damages, Logue believed he was entitled to $637,000, plus 5% statutory interest, plus the 0.5% contractual penalty, plus lost fees associated with Cline's decision to terminate Logue's father as a client. Logue reached the $637,000 figure by multiplying the $20,223,378 assets under management at the time of the sale, by the 1.5% contractual, annual management fee, by 4 years, by the expected 75% retention rate, by a 70% share of the fees. Logue sought an additional $3995, because Logue helped Cline secure Logue's father's account, but Cline voluntarily terminated that account.

¶ 37    Dale C. testified for Logue that Logue served as his financial advisor from 2008 until 2017. Dale C. had earned an MBA from the University of Wisconsin in 1968. Prior to retirement, Dale C. had worked as a chief financial officer at a company.

¶ 38    Beginning in 2008, Logue sold Dale C. approximately $1 million in inverse floater bonds. Dale C. understood the investment to be "derivatives of US Government agency mortgages." Logue proposed selling the bonds in 2017. It was a "thin market" at that time, and Dale C. would have suffered a 30% loss on the value of the bonds. However, Dale C. chose not to sell the bonds. To date, Dale C. is unsure of his "gains from return of principal," but the investment has earned $2.2 million in interest. (On cross-examination, Dale C. confirmed that he has not sold any of the bonds that Logue purchased on his behalf. The total value of his and his wife's accounts as of June 2017, as set forth in amendment 2 of the agreement, was approximately $1.7 million.)

¶ 39    On August 31, 2017, Dale C. had a telephone conversation with Cline after receiving a letter from Cline in which Cline offered his investment services. During the conversation, as Dale

12

C. recorded in his personal notebook, Cline told Dale C. that "[Logue] was a slick operator and [Logue] used religion to further his business."

¶ 40    Christine P., a retired speech pathologist, testified for Cline that she and her husband began working with Logue in 2008. Between 2008 and 2011, Christine P.'s husband handled financial matters for the family but, in 2011, he was diagnosed with Alzheimer's and Christine P. began to take the lead. Christine P. met with Logue annually to review the family investment portfolio, which she understood to contain mostly bonds. In March of 2017, Christine P. noticed that the value of her husband's account was down from approximately $190,000 to $165,000 or $160,000, and her account was down from $165,000 to $130,000. Christine P. reached out to Logue, and Logue told her not to panic. He advised that the accounts were worth more than the statements were showing and Christine P. should wait for the investment to mature. In May of 2017, Logue reached out to Christine P. to inform her that "the bonds were really losing money and that he also was—I don't remember if he said retiring or just selling the business [to Cline], and so he needed to sell all the bonds." Christine P. agreed and, by the time her accounts were transferred to Cline's management they were each worth approximately $120,000. Christine P. was upset by Logue's change in position:

"I feel that [i]n March [of 2017] when I brought up how [the accounts] had lost money and the way he presented it saying [the accounts] were worth more than that, and he acted like nothing at all was wrong, so I felt like that was a misrepresentation of the facts.

\*\*\*

And then in May [of 2017] when we got the call that he needed to sell the bonds, I kind of felt like, well, in March you didn't know this? In March you weren't already

13

preparing? Maybe not, but common sense would tell me that such a big endeavor would be planned. *** And we never got that money back."

¶ 41	Christine P. does not remember Logue ever telling her that the bonds she had been invested in were called: "inverse floater collateralized mortgage obligations." Christine P. participated in the AISG lawsuit.

¶ 42	After working with Logue, Christine P. worked with Cline for one or two years. Cline told Christine P. that "he didn't want [her] to lose any more money." From Christine P.'s perspective, Cline made "an effort to help her in that regard."

¶ 43	On cross-examination, Christine P. stated that the portfolio Cline created for her was, nevertheless, too conservative. While Christine P. did not lose any money while working with Cline, she did not earn significant gains, either. In the end, she transferred her accounts to another investment firm.

¶ 44	Christine P. further testified that Logue also sold her an insurance policy with which she was unhappy. She was unhappy because she could not afford it and because it terminated at age 72. On cross-examination, Christine P. testified that Cline helped her draft a letter of complaint regarding the insurance policy. However, Christine P. chose not to send it, explaining that it contained inaccuracies. When the court inquired as to the relevance of this line of questioning, Logue's attorney answered that it was relevant to the question of whether Cline had disparaged Logue.

¶ 45	Suzanne C., born in 1941, testified that Logue had been her financial advisor from 2012 until he sold his business in 2017. Suzanne C. could not recall the nature of her investments under Logue's tenure, but she knew that she lost money. "I was going down the tubes." Suzanne C. participated in the AISG lawsuit.

¶ 46   At the close of evidence, the trial court ordered each party to submit a written closing argument.

¶ 47   On October 20, 2022, the trial court entered a written order, providing "the court finds in favor of Logue and against Cline on the complaint and against Cline and in favor of Logue on the counterclaim." The court explained that it found both parties to be reasonably credible in their testimony. The court did not find that Logue's attempts to sell life insurance constituted a material breach of the agreement, as Logue was not successful in selling the life insurance. Further, while "[t]here was also testimony and argument that Logue committed fraud[,] the court [did] not find that this claim was proved by clear and convincing evidence."

¶ 48   As to damages, the court provided:

"2. *** The court finds evidence sufficient to find Cline in breach of the contract by failing to pay Logue 70% of the revenues generated from Logue's clients for the 4 year period.

3. There is also no dispute that Cline earned $265,160.93 from Logue's clients and that 70% of that amount would equal $185,612.67. There was one payment made by Cline of $11,883.91 leaving a balance of $173,728.76. Logue has requested a much higher amount claiming that the damages should be based on the anticipated commissions; the court finds insufficient evidence to base damages on anticipated commissions. The failure to reach the anticipated commission level was at least due in part to Logue's own activities.

*** 

5. It would be patently unjust to allow Cline to return those clients he couldn't keep while retaining those that he could and denying Logue his commissions.

15

6. However, there was testimony and evidence that certain clients were unhappy with Logue and the "inverse floater bonds" and that a claim was filed against Logue. Those 6 clients ([John B., D. Vera H., Dan H., Paul K., Mike S. and Ernest W.]) equaled $1,344,000 of the book of business that was sold. Cline could not have reasonably retained those clients. At 1.5%, the amount that Cline should have realized from those accounts is $20,160.00. Given the testimony regarding the risky nature of the inverse floater bonds, the court deducts 70% of the $20,160.00 ($14,112) from the plaintiff's award for a damage award of $159,616.76.

7. In addition, the Buy-Sell provides a .5% penalty for failure to pay. The penalty amount is $7,985.84. The court finds no authority to award interest and/or attorneys' fees."

¶ 49 On November 21, 2022, Logue moved to reconsider. He argued that: (1) the evidence supported a $637,000 damages award; (2) the $14,112 reduction was not supported by the evidence; and (3) he was entitled to statutory prejudgment interest. Further discussion of Logue's latter arguments is relevant to our analysis.

¶ 50 As to the $14,112 reduction, Logue argued: "I think the court might have mistakenly presumed that *** the six people mentioned in [the ISD investigation] letter made complaints and refused to sign up with [Cline] based upon their dissatisfaction with Logue, but there's no evidence that any of these six persons refused to sign with [Cline] as a result of any action or omission [of Logue] and I submit that the evidence shows the contrary." Logue noted that Mike S. continued to seek Logue's advice; Ernest W. decided not to sell the bonds and, thus, could not have been upset with Logue's handling of the investment; and Mike B. chose not to sign with Cline because he was moving out of state. Further, Logue reasoned, even if these six people were dissatisfied, Cline would have been entitled to a 30% share of their fees, not a 70% share. Logue did not believe

16

Cline responded to that aspect of the argument in his written response. Orally, Cline responded that the ISD's request for the six client files was "indicia that there were issues related to those clients consistent with [Cline's] testimony about the difficulty [he had] retaining clients *** in the wake of the bond losses they experienced and other regulatory inquiries." In terms of the calculation, Cline believed that 70% was the correct multiplier because Logue was entitled to a 70% share of those six clients' fees. The court ruled:

> "[W]ith regard to *** the reduction in damages because of the FINRA complaints, the court finds that there was sufficient evidence at trial to reach the conclusion that those six clients were not available to [Cline], therefore, the amount that [Cline] could have received from those clients had [Logue] not interfered in the way he is alleged to have interfered is the proper calculation."

¶ 51    As to the statutory prejudgment interest, Logue argued that the damages amount was capable of calculation as the court had done in its judgment. Cline responded that the agreement already set forth a 0.5% penalty for late quarterly payments. In addition, statutory prejudgment interest was not required because the amount due was not easily ascertainable. Cline clarified that, in light of the court's determination regarding a breach, there was no dispute that some amount was owed. Instead, there was a dispute as to the amount owed, which demonstrated that the damages award was not easily ascertainable.

¶ 52    The court ruled:

> "[W]ith regard to prejudgment interest, I think this is somewhat of a close call. However, the fact that the [parties] did include this penalty clause in the contract as well as the fact they did not provide for interest is Item Number 1 to let the amount stand.

17

Number two, \*\*\*, I agree with [Cline], the amount is simply not [easily] ascertainable. If it were there would be a fixed number. Would it be the $637,000? Would it be the money I awarded?"

¶ 53 The trial court denied the motion to reconsider. Logue timely appealed.

¶ 54                                                    II. ANALYSIS

¶ 55 Logue challenges the trial court's damages award, raising arguments substantially similar to those raised in his motion to reconsider: (1) the damages award should have been based on the anticipated, rather than the actual, retention rate; (2) the $14,112 reduction was not supported by the evidence; and (3) he was entitled to statutory prejudgment interest. For the reasons that follow, we affirm as modified.

¶ 56 We begin by reviewing the law concerning damages. The plaintiff has the burden of proving damages to a reasonable degree of certainty. *Farwell Construction Co. v. Ticktin*, 84 Ill. App. 3d 791, 804 (1980). A reasonable degree of certainty is met if "a fair degree of probability tends to establish a basis for the assessment of damages." *Id*. These general principals apply when awarding damages for lost profits. See *Midland Hotel Corp. v. Reuben H. Donnelley Corp.*, 118 Ill. 2d 306, 316 (1987). Lost profits are prospective in nature and are often the result of "several intersecting causes," making it difficult to calculate them with mathematical precision. *Id*. at 315-316. The evidence must afford a reasonable basis for the computation of damages and the defendant's breach must be traceable to a specific portion of the lost profits. *Id*. at 316. A court may not award damages on the basis of speculation, as is the case when it fails to account for the plaintiff's own actions or other significant factors. *SK Hand Tool Corp. v. Dresser Industries, Inc.*, 284 Ill. App. 3d 417, 427 (1996).

18

¶ 57        A trial court's assessment of damages will be set aside only if it is against the manifest weight of the evidence.  *Farwell*, 84 Ill. App. 3d at 804.  A damages award is against the manifest weight of the evidence if the award is arbitrary and not based on the evidence, if the trial court ignored evidence, or if its measure of damages was erroneous as a matter of law.  *Gretencord v. Cryder*, 336 Ill. App. 3d 930, 933-34 (2003); *B & Y Heavy Movers, Inc. v. Fluor Constructors, Inc.*, 211 Ill. App. 3d 975, 984 (1991).  Reviewing courts will not interfere with a trial court's award where the award is fairly supported by the evidence and there is no indication that the award was the result of passion, corruption, or prejudice.  *Klass v. Winstein, Kavensky, Wallace & Doughty*, 219 Ill. App. 3d 817, 820 (1991).  If the award falls within the flexible range of conclusions that reasonably can be supported by the evidence, it should be upheld.  *Lyon Metal Products, LLC v. Protection Mutual Insurance Co.*, 321 Ill. App. 3d 330, 347 (2001).  Also, we defer to the trial court's reasonable inferences from the evidence and its findings regarding the credibility of the witnesses.  *Gretencord*, 336 Ill. App. 3d at 934.

¶ 58                    A. Actual Rather than Anticipated Retention Rate

¶ 59        Logue argues that, in light of Cline's breach of the agreement, the trial court should have awarded Logue the amount contemplated by the parties when they entered into the agreement, approximately $637,000.  Logue points to his own testimony that he anticipated a $637,000 payment, a figure he reached by multiplying the $20,223,378 in assets under management at the time of the sale, by the 1.5% contractual, annual management fee, by 4 years, by the expected 75% retention rate, by a 70% share of the fees.  Logue also points to the June 13, 2017, e-mail from Cline to Logue, which set forth that a 1.5% fee for the current assets under management over the term of the agreement would result in a $925,000 payment to Logue, which, assuming a 75% retention rate, would be reduced to $693,750, *i.e.*, reasonably close to $637,000.  Further, Logue

19

urges that it was Cline's conduct, not his own, that resulted in a lower than anticipated retention rate. Logue notes that Cline stopped calling clients in late September 2017, returned client files in October 2017, disparaged Logue to Dale C. (Logue's largest client), and terminated his professional relationship with Logue's father.

¶ 60    The trial court's determination that Logue failed to present sufficient evidence of damages based on an anticipated retention rate and corresponding fees was not against the manifest weight of the evidence. Like lost profits, anticipated fees are prospective in nature and, therefore, difficult to calculate with mathematical precision. See *Midland*, 118 Ill. 2d at 315-16. To avoid speculation on a prospective loss, the court must often consider several intersecting factors, including a plaintiff's own conduct. *SK Hand Tools*, 284 Ill. App. 3d at 427.

¶ 61    Here, the trial court determined that Logue's own activities contributed to the parties' failure to reach the anticipated fees. Logue does not dispute that he attempted to sell life insurance to his former clients, nor does he dispute that he concentrated his clients' accounts in inverse floater bonds. Ample evidence in the record supports that inverse floater bonds were inappropriate for Logue's clients, given their limited income, limited net worth, and conservative investment goals. The court credited this theory. Indeed, on appeal, Logue does not argue in defense of his actions but, rather, argues in conclusory fashion that his actions did not *cause* the parties' failure to reach the anticipated fees: "there was absolutely no record evidence that any of Logue's clients failed to sign up with [Cline] based on Logue's actions or omissions."

¶ 62    We disagree. For example, Cline testified that he received a cool reception from many of Logue's former clients. He called each client at least once, if only to leave a voicemail. Cline's attorney instructed him to stop calling Logue's former clients in September 2017. Christine P. and Suzanne C. testified that they had been dissatisfied with Logue's service. Additionally, exhibit

20

No. 6 showed that 44 former clients, including Christine P. and Suzanne C., participated in a FINRA complaint against AISG on the basis that AISG failed to implement adequate parameters for Logue's sale of inverse floater bonds. Although Cline was able to secure Christine P. and Suzanne C. as clients, the trial court may have reasonably inferred that other dissatisfied clients chose to decline Logue's referral.

¶ 63 Given the trial court's reasonable inference that Logue's own actions contributed to a retention rate that was lower than anticipated, we cannot say that the trial court's decision to base the damages award on the actual versus the anticipated retention rate and corresponding fees is against the manifest weight of the evidence.

¶ 64                                B. The $14,112 Reduction

¶ 65 Logue argues that the trial court's decision to reduce the damages award by $14,112 was not based on the evidence. See *Gretencord*, 336 Ill. App. 3d at 933-34 (a ruling is against the manifest weight of the evidence if it is not based on the evidence, unreasonable, or arbitrary). We agree.

¶ 66 The court explained its decision to reduce the damages award by $14,112 in paragraph 6:

> "However, there was testimony and evidence that certain clients were unhappy with Logue and the inverse floater bonds' and that *a claim was filed against Logue. Those 6 clients ([John B., D. Vera H., Dan H., Paul K., Mike S. and Ernest W.]) equaled $1,344,000 of the book of business that was sold*. Cline could not have reasonably retained those clients. At 1.5%, the amount that Cline should have realized from those accounts is $20,160.00. Given the testimony regarding the risky nature of the inverse floater bonds, the court deducts 70% of the $20,160.00 ($14,112) from the plaintiff's award for a damage award of $159,616.76." (Emphasis added.)

¶ 67        Undisputed record evidence contradicts the trial court's finding that six clients filed a claim against Logue. The six clients to whom the court refers were the subject of an investigation by the ISD. No evidence in the record supports that those six clients filed a complaint against Logue. To the contrary, Mike S. continued to seek guidance from Logue through October 11, 2017, when Cline began to conduct himself as though the agreement had been terminated. Granted, different evidence in the record, such as exhibit No. 6, establishes that a group of unnamed clients participated in a FINRA complaint in relation to the sale of inverse floater bonds. However, that lawsuit was against AISG, not Logue. Additionally, at the hearing on the motion to reconsider, the trial court stated that the six clients were part of a FINRA complaint, though the evidence affirmatively establishes only that they were part of an ISD investigation. As such, the trial court asserted incorrect statements of fact in support of its decision.

¶ 68        Rather than address these factual discrepancies underlying the trial court's rationale for reducing the damage award, Cline instead argues broadly that the trier of fact has great discretion in fashioning a damages award and that the evidence generally supports that a significant cohort of Logue's clients was dissatisfied with Logue's services such that they would not have followed Logue's recommendation to seek Cline's services. This may be so, but we are also mindful that, when awarding damages that are prospective in nature, the evidence must afford a reasonable basis for the computation of damages and the defendant's breach must be traceable to a specific portion of the lost profits. *Midland*, 118 Ill. 2d at 316. For the reasons stated, the trial court's rationale for its computation was unreasonable because the evidence contradicts that the six clients named by the court filed a lawsuit against Logue and that those six clients, specifically, were not available to Cline. We further observe that the trial court otherwise accounted for Cline's position that Logue's actions deterred his former clients from signing with Cline when the court chose to base

22

the damages award on actual retention and fees rather than anticipated retention and fees. For these reasons, we modify the trial court's damages award by an increase of $14,112.

¶ 69                                  C. Statutory Interest

¶ 70        We next address Logue's argument that the trial court erred in declining to award $23,140 in statutory prejudgment interest. Section 2 of the Interest Act provides:

> "Creditors shall be allowed to receive at the rate of five (5) per centum per annum for all moneys after they become due on any bond, bill, promissory note, or other instrument of writing ***. In the absence of an agreement between the creditor and debtor governing interest charges, upon 30 days' written notice to the debtor, an assignee or agent of the creditor may charge and collect interest as provided in this [s]ection on behalf of a creditor." 815 ILCS 205/2 (West 2022).

¶ 71        Statutory prejudgment interest is compensatory in nature. *Milligan v. Gorman*, 348 Ill. App. 3d 411, 416 (2004). It may be awarded even if the claimed right or amount due require legal ascertainment. *Greater New York Mutual Insurance Company v. Galena*, 2022 IL App (2d) 210394, ¶ 19. However, the amount due must be liquidated or subject to an easy determination by calculation or computation. The claim is unliquidated "[i]f judgment, discretion, or opinion, as distinguished from calculation or computation[,] is required to determine the amount of the claim." *Certain Underwriters at Lloyd's, London v. Abbott Laboratories*, 2014 IL App (1st) 132020, ¶ 71 (internal quotation marks and citation omitted.) We will uphold a trial court's decision regarding statutory prejudgment interest unless it is an abuse of discretion or against the manifest weight of the evidence. *Certain Underwriters*, 2014 IL App (1st) 132020, ¶ 71 (abuse of discretion); *Oldenburg v. Hagemann*, 207 Ill. App. 3d 315, 327 (1991) (manifest weight).

23

¶ 72          Here, the aspect of the trial court's judgment that was, arguably, subject to easy ascertainment was its award for late quarterly payments. There, the court elected to apply the formula set forth in the contract. However, the court declined to award statutory prejudgment interest for these late quarterly payments primarily because the agreement already set forth a remedy for late quarterly payments—the 0.5% late fee. Logue challenges this decision, arguing that there would have been nothing incompatible or erroneous with awarding him the 0.5% late fee *and* a 5% statutory prejudgment interest award. He cites *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938), for the general proposition that a waiver is an intentional relinquishment of a known right, and he notes that the agreement itself does not expressly waive statutory prejudgment interest nor did the parties testify to their intent to waive statutory prejudgment interest.

¶ 73          Logue's argument, however, does not discuss the language in section 2 that plainly allows a creditor and debtor to reach their own agreement as to prejudgment interest. 815 ILCS 205/2 (West 2022) ("In the absence of an agreement between the creditor and debtor governing interest charges *** an assignee or agent of the creditor may charge and collect interest as provided in this [s]ection"); see also *Premier Electrical Construction Co. v. American National Bank of Chicago*, 276 Ill. App. 3d 816, 829 (1995) (parties to a contract may negotiate for a prejudgment interest rate). Indeed, rulings from other jurisdictions with similar interest statutes support that a court may reasonably consider a contractual, interest-based late fee as compensatory in nature and capable of trumping a statutory prejudgment interest provision which is also compensatory in nature. See, *e.g.*, *Spiritual Trees v. Lamson and Goodnow Manufacturing Co.*, 424 F. Supp. 2d 298, 301 (D. Mass. 2006) (the prevailing plaintiff in a breach-of-contract action was not entitled to award of statutory prejudgment interest, where the damages awarded to the plaintiff represented unpaid commissions plus late fees and, therefore, compensated the plaintiff for her inability to

24

timely access the commissions). Also, we disagree with Logue's implicit argument that the contract's characterization of the late fee as a "penalty" renders it a bargained-for punitive sanction that is somehow independent of the prejudgment statutory interest provision. See *First National Bank & Trust Co. of Evanston v. Schermerhorn and Co., Inc.*, 192 Ill. App. 3d 1057, 1060 (1989) (accepting the premise that late fees collected as a penalty for late payment of rent were compensatory in nature). Such a reading of the contract would be at odds with the general rule that punitive damages are not recoverable for breach of contract because the plaintiff is entitled only to the benefit of his bargain. *Cruthis v. Firstar Bank*, 354 Ill. App. 3d 1122 (2004).

¶ 74    Although our analysis could end here, we briefly address the trial court's secondary determination that statutory prejudgment interest was not appropriate because the damages were not easily ascertainable. Granted, the trial court chose to utilize the formula set forth in the agreement as a starting point in calculating its damages. However, this does not mean that the trial court in this case was *required* to issue a damages award that was in lock-step with the formula. Notably, Logue himself continues to argue that the evidence supports a much higher award. See *Farwell*, 84 Ill. App. 3d at 809-810 (significant differences in the amount sought versus the amount awarded indicate that the amount was not easily ascertainable); see also *Alguire v. Walker*, 154 Ill. App. 3d 438, 448 (1987) (when alternative measures of damages are submitted to the trial court for its consideration, the damages typically are not easily ascertainable). The court considered the evidence to decide whether and to what degree Logue's conduct impacted anticipated fees (which, by their nature, are not easily ascertainable) and whether and to what degree Logue's conduct warranted a reduction in his award. These considerations demonstrate the trial court exercised discretion in awarding damages, as opposed to unquestioningly applying a formula to uncontroverted facts. See *Certain Underwriters*, 2014 IL App (1st) 132020, ¶ 71 (the court's

exercise of judgment in fashioning a damages award indicates that it was not easily ascertainable). Accordingly, for this reason as well, the trial court reasonably declined to award statutory prejudgment interest.

¶ 75    Logue's argument to the contrary hinges on his assertion that the trial court is not entitled to deference and, instead, Logue was entitled to statutory prejudgment interest as a matter of law. However, the cases Logue cites are distinguishable. See *Chandra v. Chandra*, 2016 IL App (1st) 143858, ¶ 51; *Kruse v. Kuntz*, 288 Ill. App. 3d 431, 437 (1996).

¶ 76    In *Chandra*, the trial court denied statutory prejudgment interest on equitable principles, explaining that it did not wish to "punish" one of the parties. *Chandra*, 2016 IL App (1st) 143858, ¶¶ 1, 52. The appellate court acknowledged that, ordinarily, it would afford deference to the trial court's decision not to grant statutory prejudgment interest. *Id.* ¶ 46. However, it chose to review the decision *de novo*, explaining that there was no factual dispute as to a fixed debt on a written instrument and that the trial court had decided the issue of prejudgment interest on the pleadings. *Id.* More specifically, the contract in *Chandra* provided that the codefendant would bring a *qui tam* action and, if a recovery were had, she would receive 40% of that recovery and the other parties would equally split the remainder. *Id.* ¶ 51. Subsequently, there was a recovery, set forth in a settlement agreement, which provided that the fixed sum of $1,355,569 would be disbursed on a date certain. *Id.* The appellate court noted that, as of that date certain, the "only thing left to do was to pay out the fixed sum to each party as calculated pursuant to the terms of the contract they had signed long ago." *Id.* Thus, the appellate court determined that the sum was easily ascertained such that statutory prejudgment interest was warranted. *Id.* Similarly, in *Kruse*, 288 Ill. App. 3d at 437, the note at issue provided a sum due and a due date such that there was no discretion to exercise in awarding damages.

26

¶ 77　　　　　Here, the issue of statutory prejudgment interest did not arise in the context of a motion for judgment on the pleadings. Also, for the reasons set forth above, the instant case involved a more complex fact pattern requiring the trial court to exercise its judgment in fashioning the damages award. Accordingly, we affirm the trial court's decision to deny statutory prejudgment interest.

¶ 78　　　　　　　　　　　　　　　　III. CONCLUSION

¶ 79　　　　　The judgment of the circuit court of Du Page County is affirmed as modified.

¶ 80　　　　　Affirmed as modified.