2025 IL App (3d) 240114

Opinion filed March 3, 2025

_____

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2025

| | | |
|---|---|---|
| VISION ENERGY, LLC, | ) | Appeal from the Circuit Court |
| | ) | of the 21st Judicial Circuit, |
| Plaintiff and Counterdefendant-Appellee, | ) | Kankakee County, Illinois. |
| | ) | |
| v. | ) | |
| | ) | |
| JANE E. SMITH, | ) | Appeal No. 3-24-0114 |
| | ) | Circuit No. 21-MR-116 |
| Defendant, Counterplaintiff, and Third-Party Plaintiff-Appellant | ) | |
| | ) | |
| (J. Turner Hunt, Third-Party Defendant-Appellee). | ) | Honorable |
| | ) | Lindsay A. Parkhurst |
| | | Judge, Presiding. |

_____

JUSTICE DAVENPORT delivered the judgment of the court, with opinion.
Justice Holdridge concurred in the judgment and opinion.
Justice Anderson specially concurred, with opinion.

_____

**OPINION**

¶ 1        This case involves a dispute between plaintiff, Vision Energy, LLC (Vision), and its former

employee, defendant Jane E. Smith, concerning a memorandum of understanding (MOU) that

provided Smith with royalties tied to a wind farm's construction and energy production. In a

previous appeal, we affirmed the trial court's entry of summary judgment in favor of Vision on a

counterclaim brought by Smith under the Illinois Wage Payment and Collection Act (820 ILCS 115/1 *et seq.* (West 2020)). *Vision Energy, LLC v. Smith*, 2024 IL App (3d) 230289-U, *appeal denied*, No. 130899 (Ill. Sept. 25, 2024).

¶ 2     Relevant to this appeal, Smith also brought a counterclaim against Vision and a third-party claim against its sole owner, J. Turner Hunt, for breach of the MOU. She alleged her royalty payments ceased in 2017. The trial court granted partial summary judgment to Smith, finding Vision breached the MOU but reserving the issue of damages. After a bench trial, the court entered a judgment awarding Smith $237,428.14, setting a formula for calculating future royalties and denying Smith's request for prejudgment interest under section 2 of the Interest Act (815 ILCS 205/2 (West 2022)).

¶ 3     Smith appeals. She contends the trial court erred when it (1) used extrinsic evidence to interpret the MOU, which resulted in a smaller damages award than what was required by the MOU, and (2) denied her request for prejudgment interest. We agree with Smith's second contention but not her first. We therefore reverse the trial court's denial of Smith's request for prejudgment interest and remand for the trial court to calculate and award interest to Smith. Otherwise, we affirm the trial court's judgment.

¶ 4                                    I. BACKGROUND

¶ 5                                 A. The K4 Wind Farm

¶ 6     Hunt is Vision's sole owner. In 2007, Vision began developing the K4 Wind Farm in Ford, Iroquois, Kankakee, and Livingston Counties. Vision enlisted Marci Burton, Brent Creek, and Jeff Harris to assist with the development. Vision's activities included testing the area, leasing property to site wind turbines, and obtaining necessary easements and permits. In exchange for their help, Vision promised Creek, Burton, and Harris each a share of the wind farm. The project's assets,

2

primarily the leases and attendant easements and permits, were placed in a limited liability company, K4 Wind Farm, LLC. In August 2008, Hunt formed Friends of K4WF, LLC (Friends),[1] which was a vehicle to ensure Burton, Creek, and Harris would receive future payouts from the wind farm. Friends owned 10% of K4 Wind Farm, LLC, which held the project assets. Friends had four members: Burton, Creek, Harris, and, as managing member, Vision. Harris held 40% of Friends' income-producing shares, Burton and Creek each held 30%, and Vision held none.

¶ 7        In 2009, Orion Energy Group, LLC (Orion), invested money into the K4 Wind Farm project and in exchange received a 20% interest in the wind farm. Orion, Vision, and Friends formed a limited liability company, OEG/Vision/Friends, LLC (OVF), to hold K4 Wind Farm, LLC. Vision had a 70% interest in OVF, Orion had a 20% interest, and Friends had a 10% interest.

¶ 8        In 2011, OVF formed a joint venture with Mineral Acquisition Partners (MAP) to facilitate the wind farm's construction and monetization. MAP initially invested $6 million in the joint venture. MAP's initial investment was used to pay development costs. MAP received an interest in any future royalties derived from a sale of the project.

¶ 9        Around the same time, Orion, Vision, and Friends restructured OVF. Under the new structure, Orion and Vision each held 45% interests in K4 Wind Farm, LLC, and Friends retained its 10% interest.

¶ 10       In 2014, a French government-owned electric utility company, Électricité de France (EDF), purchased the right to construct and operate the wind farm. In exchange, EDF agreed, among other things, to make payments upon certain construction milestones (milestone payments) and ongoing royalty payments from the production and sale of wind energy. The wind farm was sold and constructed in two phases: Pilot Hill and Kelly Creek. Pilot Hill became operational in 2015 and

---

[1]Friends is also identified in the record as "Friends of K4, LLC."

3

generates 175 megawatts of power. Kelly Creek became operational in 2016 and generates 184 or 188[2] megawatts.

¶ 11     OVF received four milestone payments during the wind farm's construction, totaling $6.5 million. Two $1.25 million payments were related to Pilot Hill, and two $2 million payments were related to Kelly Creek.

¶ 12     EDF paid a 3.75% royalty on Pilot Hill's energy-production income and a 4.25% royalty on Kelly Creek's energy-production income. The royalties were paid to a passthrough entity, K4 Wind Land Holdings, LLC. These moneys, which we will refer to as the total royalty pool, were distributed as follows: MAP received 60% of Pilot Hill-derived royalties and approximately 53% of Kelly Creek-derived royalties, while OVF received 40% of Pilot Hill-derived royalties and approximately 47% of Kelly Creek-derived royalties. OVF then distributed its share of the total royalty pool, which we will refer to as the OVF royalty pool, to Orion, Vision, and Friends per their agreement. Finally, Friends paid shares to its members and, on several occasions, to Smith as well.

¶ 13     In September 2014, before EDF began paying energy-production royalties, Orion, Vision, and Friends again restructured their ownership of OVF, effectively modifying the royalty shares they would receive from the OVF royalty pool. Orion was to receive 56.78% of the OVF royalty pool, Vision 35.36%, and Friends 7.86%.

¶ 14                              B. The Parties' Contractual Dispute

¶ 15     In July 2008, Vision hired Smith to manage its office on a part-time basis. Vision paid Smith an hourly wage throughout her tenure with Vision. According to Smith, Harris was Vision's

---

[2]The record contains both figures.

4

"main representative who worked out of the office." In late 2010, however, Harris left Vision, and many additional duties fell on Smith.

¶ 16       In 2012, Smith asked Vision to increase her pay and for a percentage of the company, which would provide her with royalties. After negotiations, Smith and Vision signed the MOU in July 2012. The MOU was confined to a single page and stated as follows:

"Whereas, K4 Wind Farm LLC ('K4WF') *** is developing a wind farm in Kankakee, Iroquois, Ford and Livingston Counties, Illinois.

Whereas, Friends of K4 LLC ('Friends') *** is a 10% owner of K4WF.

Friends currently has 4 Members, which includes, Brent Creek (30%), Marci Burton (30%) and Jeff Harris (40%) and Vision Energy, LLC (0%), the managing member.

Whereas, Creek, Burton and Harris have previously agreed to reduced monthly compensation and Vision has decreased compensation paid to Creek, Burton and Harris as a pre-requisite of their admittance to Friends.

Whereas, Jane E. Smith is the sole on-site employee of Vision Energy in Illinois and is a valued development specialist working on the K4WF since July 1, 2008.

Whereas, Jane E. Smith, an hourly employee who works a regular weekly schedule, has not agreed to reduced monthly pay. Further, Jane E. Smith was not known to Vision at the time of the formation of Friends and the admittance of Friends' members.

Whereas, Vision is unable to admit Jane E. Smith to Friends as a member as this would require undue legal complications on Friends and Friends['] relationship with the other entities that are also owners of K4WF.

Whereas, Vision Energy desires to provide compensation to Jane E. Smith similar to what Creek or Burton may receive as a result of Creek or Burton's membership interest

5

in Friends. All parties involved in the K4 Wind Farm understand as each portion of the project is built Jane E. Smith is included in the Special Project Vehicle. Jane has committed to this project until the K4 Wind Farm is constructed.

Now therefore, effective immediately and irrevocably, Vision Energy LLC agrees to provide Jane E. Smith with compensation equal to 2% of any and all portions of the K4 Wind Farm up to 150 [megawatts] and 3% of any and all portions of the K4 Wind Farm over 150 [megawatts], said compensation being of same like kind and at the same time as received by said member of Friends, based on the following conditions:

(1) Fixed Wage. Jane E. Smith, an hourly employee who works a regular weekly schedule, has agreed to a fixed wage of $1.00 per hour increase per year starting July 1, 2013.

(2) Confidentiality. Jane E. Smith shall treat this [MOU] as confidential and shall not disclose such information to anyone other than those without an absolute need to know, such as family members and her family attorney.

(3) Longevity. Should Jane E. Smith not survive, this payment will go as willed to her spouse, David C. Smith, or her child, Luke D. Smith."

(4) K4WF. If Vision Energy should sell ownership of the K4 Wind Farm project, the negotiations will include honoring this [MOU] between Jane E. Smith and Vision Energy LLC."

¶ 17      In August 2014, Smith's employment with Vision ended, and she began working for EDF. She remained with EDF until she retired in February 2017, after Kelly Creek became operational.

¶ 18      In September 2014, Smith began receiving payments under the MOU. Smith received three payments, totaling $91,486, derived from the first three of the four milestone payments remitted

6

to OVF. From April 2016 to May 2017, Smith received energy-production royalties totaling $9385.78. She received no other payments.

¶ 19                                C. Smith's Breach of Contract Claim

¶ 20        In our order disposing of Smith's prior appeal, we discussed the procedural history of this case in some detail. *Vision Energy*, 2024 IL App (3d) 230289-U, ¶¶ 26-43. We limit our discussion to the claim at issue in this appeal.

¶ 21        Vision initiated this case in 2021, when it filed a declaratory judgment complaint against Smith. In response, Smith brought counterclaims against Vision and a third-party complaint against Hunt. Among her claims, Smith asserted Vision and Hunt breached the MOU by underpaying her royalties until 2017 and failing to pay any royalties thereafter.[3] She also sought a declaration that Vision and Hunt were obligated to pay the amounts prescribed in the contract when they became due.

¶ 22        Smith moved for summary judgment on her breach of contract claim. She attached an affidavit from her attorney calculating her alleged damages, consisting of unpaid amounts derived from the fourth milestone payment and energy-production royalties. Counsel calculated the unpaid energy-production royalties as a percentage of the total royalty pool rather than the OVF royalty pool.

¶ 23        In response, Vision and Hunt in part argued that Smith's formula for calculating damages was not supported by the MOU's language. They maintained the contract's sole reasonable interpretation was that Smith's royalties were to be calculated from the OVF royalty pool, as that was consistent with the compensation arrangement for Creek and Burton, both of whom were

---

[3]Smith also named Orion and OVF as third-party defendants. They are no longer parties to this action. See *Vision Energy*, 2024 IL App (3d) 230289-U, ¶ 28.

7

referenced in the MOU. According to Vision and Hunt, Smith's interpretation of the MOU placed her on par with the project's top-tier financial investors, and neither party contemplated as much when they signed the MOU.

¶ 24    In November 2022, the trial court granted partial summary judgment to Smith on her breach of contract claim. Specifically, the court found the MOU was an enforceable contract, Vision breached the MOU, and injury resulted to Smith. The court reserved the issue of damages.[4]

¶ 25                                    D. Bench Trial

¶ 26    The matter proceeded to a bench trial on the issue of damages. The trial essentially came down to the trial court's interpretation of the MOU and whether it required Smith's royalties to be calculated from the total royalty pool or the OVF royalty pool. The parties, however, partially agreed on the formula to be used to calculate damages. Smith was entitled, from whichever pool, to 2.14% of the royalties related to Pilot Hill's construction and energy production[5] and 3% of those related to Kelly Creek's energy production. They also agreed to the amounts contained in each royalty pool. In addition to what is set forth above, the following evidence was presented.

¶ 27    Smith testified she took over many of Harris's responsibilities when he left Vision. She felt her increased workload merited a percentage share of the wind farm. In 2012, she and Vision agreed to the terms of the MOU.

¶ 28    Though the court had already found Vision breached the MOU, Smith's attorney asked Smith about the circumstances of the breach. Smith explained that she began asking for reports to verify the amount of her royalties. The court admitted without objection several e-mails between

---

[4]During the hearing, the trial court stated its interpretation was constrained by the four corners rule and extrinsic evidence would not be admitted. Vision and Hunt moved to reconsider this ruling, stating extrinsic evidence should be allowed. The court denied the motion before trial.

[5]$((0.02 \times 150 \text{ megawatts}) + (0.03 \times 25 \text{ megawatts})) / 175 \text{ megawatts} = 0.0214 \text{ or } 2.14\%$.

Hunt and Smith that were sent between January and May 2017. In those e-mails, Smith asked for energy-production reports. Hunt and Smith also discussed Smith becoming a member of Friends. Hunt wrote that he would be sending an amended Friends operating agreement that would make her a 20% member of Friends. Smith eventually asked for a larger share of Friends, stating, "I am looking at the MOU now. It says 20% up to 150 [megawatts] and 30% over 150 [megawatts]." Hunt responded that Smith's rights under the MOU were equivalent to a 25.86% share of Friends, and Smith confirmed that Hunt's determination "look[ed] like what [they] agreed to."

¶ 29   Smith also introduced a May 22, 2017, e-mail she had sent to Burton with a copy to Hunt. In the e-mail, which was admitted into evidence, Smith asked to meet with Hunt, Burton, and Creek and asked that they bring bookkeeping records and bank statements so she could determine how her royalties were being calculated. Smith also stated she was "still waiting to receive 4th quarter [royalty] payments from Pilot Hill (20% up to 150 [megawatts] and 30% for 25 [megawatts] and Kelly Creek (30% for all)." Asked to explain why she referenced 20% and 30% in the e-mail, Smith testified Burton was writing the checks for Friends and those numbers were "comparable" to the 2% and 3% referenced in the MOU. Hunt responded to Smith's e-mail saying he would call her the next day.

¶ 30   Smith testified Hunt called her the next day and was "very irate" with her for asking questions. Hunt demanded she sign the amended Friends operating agreement, stating that if she did not sign, "he would do something very unfavorable to [Smith]." Hunt repeated this threat in an e-mail. Smith did not sign the amended agreement, and she never received another royalty payment.

¶ 31   Smith agreed she was knowledgeable about the project. She knew Harris, Burton, and Creek were members of Friends and owned 40%, 30%, and 30%, respectively, of the income-

9

producing shares. When Smith signed the MOU, she was aware Orion was involved in the project but did not know how much money it had invested or what percentage of the wind farm it held. Smith knew very little about MAP's involvement with the project, and her knowledge of Friends was limited to what was stated in the MOU.

¶ 32    Hunt testified about the project's history and the royalty structure, which has been set forth above. During his testimony, both parties attempted to elicit testimony regarding the meaning of language throughout the MOU. The court reminded the parties its task was to interpret the MOU based only on the language used, and Hunt's subjective intent was not relevant.

¶ 33    Hunt agreed the MOU obligated Vision to make Smith's payments. However, after Vision made two payments, he directed Friends to make Smith's payments. Hunt acknowledged the MOU was never superseded or amended, even after OVF restructured its ownership for the second time, decreasing Friends's interest. Hunt did not contest that Smith was owed additional royalties but believed Smith was "asking for *** many multiples of what *** [the MOU] represents."

¶ 34    The court asked Hunt about a couple of provisions in the MOU. Specifically, the court referenced the MOU's statement that Vision was unable to admit Smith into Friends due to legal complications. It asked Hunt whether that meant Smith was never a member of Friends. Hunt responded affirmatively. The court then referenced the MOU's statement that Vision desired to provide compensation to Smith similar to what Burton or Creek might receive via their respective interests in Friends. It asked Hunt whether his expectation was that "[Smith] would be paid under the 10 percent" that Friends was entitled to at the time of the MOU's execution. Hunt responded affirmatively. Upon further questioning, Hunt told the court that Smith's contribution to the project was similar to Burton's and Creek's; she had not contributed millions of dollars like those whose royalties were calculated from the total royalty pool. The court then asked Hunt whether the MOU

10

was "trying to *** say that [Smith] couldn't be a member of Friends but she's gonna be paid like the member of Friends." Hunt responded, "Exactly like the member of Friends." Finally, the court referenced the MOU's provision that begins with "Now therefore, effective immediately and irrevocably." It asked whether that paragraph meant Smith was entitled to 2% of the royalty, which would be equivalent to 20% of Friends. Hunt responded affirmatively.

¶ 35    Brent Creek testified that he became involved in the K4 project in 2007. He was involved with wind testing before his efforts shifted to land acquisition. Creek, Burton, Harris, and Hunt were all involved with that aspect of development. In exchange for Creek's efforts, Vision and Hunt gave him an interest in the project, and Friends was formed for this purpose. Creek was given a 30% interest in Friends, which he understood was equivalent to a 3% share of the wind farm.[6]

¶ 36    In September 2014, Creek began receiving compensation via his interest in Friends. Creek received shares of the four milestone payments: $60,000 in September 2014, $60,000 in July 2015, $29,360 in April 2016, and $34,326 in January 2017, for a total of $183,686. From 2017 until 2019, Creek received $52,558 in energy-production royalties from OVF, via his interest in Friends. According to Creek, the members of Friends decide when to take distributions, and Creek and Burton did not take any distributions in 2020, 2021, or 2023. They each took a distribution of $26,550 in 2022. According to an exhibit, OVF distributed a total of $462,597 in energy-production royalties to Friends between 2017 and 2023. By his 30% share, Creek was entitled to $138,779.10 of those royalties.

¶ 37    Creek never told Smith that Friends's interest in the wind farm was reduced from 10% to 7.86%. Creek was not sure how Smith could have known of that fact, since she was not a member of Friends.

_____

[6]Thirty percent (30%) of 10% is 3%.

11

¶ 38       Smith also called two expert witnesses, a statistical analyst and a certified public accountant. The statistical analyst opined that as of June 2023, Smith had suffered $527,388.35 in total damages, including interest, broken down as follows. Vision owed Smith a total of $441,528.72, consisting of $368,076.52 in energy-production royalties and $73,452.20 in milestone payments, plus a statutory 5% interest of $53,308.59 and $32,551.04, respectively.

¶ 39       The statistical analyst calculated Smith's damages from the total royalty pool. That is, she multiplied EDF's payments into the total royalty pool by factors of 2.14% and 3% for Pilot Hill and Kelly Creek, respectively. As noted, the parties agreed these percentages were equivalent to the MOU's reference to 2% and 3% (depending on megawattage).

¶ 40       Smith also called an expert accountant, who opined that the calculations made by the statistical analyst were correct and reliable.

¶ 41                            E. The Circuit Court's Decision

¶ 42       The court found Smith was entitled to $173,500 milestone-derived royalties and had been paid $91,286, meaning Vision owed Smith $82,214 in milestone-derived royalties.[7] The court also set a formula for calculating the past-due and future energy-production royalties, based on its interpretation of the MOU. Smith was entitled to 2.14% of the OVF royalty pool derived from Pilot Hill and 3% of the OVF royalty pool derived from Kelly Creek. The court rejected Smith's prejudgment interest claim. It also directed the parties to calculate the energy-production royalties and submit a proposed final judgment order.

¶ 43       In a memorandum of its decision, the court explained "[t]he contract call[ed] for like kind payments similar to Friends of K4, but does not call for exactly the same payments," which the court "interpret[ed] *** to mean *** Smith is to be compensated for royalties at the level of Friends

---

[7](2 x $1.25 million x 0.0214) + (2 x $2 million x 0.03) = $173,500

of K4 which is based on the royalty payments made to OVF." The court based its interpretation on the MOU's recital, stating Vision desired "to provide compensation to Smith similar to what Creek or Burton may receive," and its operative provision that Smith's compensation was to be "of the same like kind and at the same time as received by said members of Friends." The court found further support in Smith's May 22, 2017, e-mail in which Smith stated her share of Pilot Hill was "20% up to 150 [megawatts] and 30% for 25 [megawatts]" and her share of Kelly Creek was "30% for all." The court explained Smith's e-mail and both parties' testimonies were consistent with the MOU's statements that the compensation was to be "of like kind" and "similar" to what Burton and Creek were to receive via their membership in Friends. The court, however, rejected Vision and Hunt's suggestion that the further dilution of Friends's share of the royalties, after Smith signed the MOU, should reduce Smith's entitlement. The court explained the contract's silence on this point created an ambiguity that it would resolve against Hunt, who drafted the MOU. As to Smith's prejudgment interest claim, the court found Smith was not a "creditor" under section 2 of the Interest Act and was therefore not entitled to prejudgment interest.

¶ 44    The court later entered a final judgment order, awarding Smith $237,428.14, consisting of $82,214 in unpaid milestone payments and $155,214.14 in energy-production royalties. The judgment also memorialized the formula set forth above (*supra* ¶ 42) for calculating future royalties. This appeal followed.

¶ 45                                II. ANALYSIS

¶ 46    On appeal, Smith challenges the trial court's damages award. Specifically, she argues the court's damages award was based on an improper interpretation of the MOU. She also contends the court erred when it rejected her claim for prejudgment interest. We address each contention in turn.

13

¶ 47                                  A. The Damages Award

¶ 48        Smith argues the trial court erred in its damages award because it applied the wrong

measure of damages—that is, it concluded her royalties were to be calculated from the OVF royalty

pool. Specifically, Smith asserts the court improperly relied on extrinsic evidence when

interpreting the MOU, leading to an interpretation that was contrary to the MOU's plain language.

Smith maintains the MOU's plain language required her royalties to be calculated from the total

royalty pool.

¶ 49                                  1. *Standard of Review*

¶ 50        After a bench trial, we review the trial court's damages award against the manifest weight

of the evidence. *Morse v. Donati*, 2019 IL App (2d) 180328, ¶ 17. Under this standard, we may

reverse if the trial court applied an incorrect measure of damages. *Id.* In this case, the correct

measure of damages was dependent on an interpretation of the MOU. To that extent, our review

is *de novo*. *Storino, Ramello and Durkin v. Rackow*, 2015 IL App (1st) 142961, ¶ 18 (the

interpretation of contract is a question of law subject to *de novo* review); *Koehler v. The Packer

Group, Inc.*, 2016 IL App (1st) 142767, ¶ 60 (the applicable measure of damages in a given case

is a question of law subject to *de novo* review).

¶ 51                    2. *The Trial Court Applied the Correct Measure of Damages*

¶ 52        The purpose of damages in a breach of contract case is to put nonbreaching parties in the

same position they would have been in had the contract been performed. *Santorini Cab Corp. v.

Banco Popular North America*, 2013 IL App (1st) 122070, ¶ 26. Thus, the proper measure of

damages "is the amount that will compensate the aggrieved party for the loss which either

fulfillment of the contract would have prevented or which the breach of it has entailed." (Internal

quotation marks omitted.) *Id.* When deciding how to calculate damages, the court must examine

14

the exact interest harmed and should ensure it does not provide the nonbreaching party with a windfall. *Id.*

¶ 53    The trial court calculated the damages for the unpaid royalties by multiplying Smith's percentage shares by the royalties paid into the OVF royalty pool. Whether this was the correct measure of damages rests on the meaning of the MOU's operative provision, which reads in relevant part as follows:

> "Now therefore, effectively immediately and irrevocably, Vision Energy LLC agrees to provide Jane E. Smith with compensation equal to 2% of any and all portions of the K4 Wind Farm up to 150 [megawatts] and 3% of any and all portions of the K4 Wind Farm over 150 [megawatts], said compensation being of same like kind and at the same time as received by said member[s] of Friends, based on [certain] conditions[.]"

¶ 54    Our task is to determine what the parties intended when they agreed to this language. See *First Bank & Trust Co. of Illinois v. Village of Orland Hills*, 338 Ill. App. 3d 35, 40 (2003) (the objective of contractual interpretation is to ascertain the parties' intent). If a contract's language is unambiguous, we determine the parties' intent from only the contract's language. *Id.* Because we presume that parties agree to contractual language purposefully, we read the provisions of a contract in light of the whole, not in isolation, and we give effect to each and every word, if possible. *Id.* Thus, we will not interpret a contract "in a way that would nullify its provisions or render them meaningless." *Id.*

¶ 55    The trial court concluded the MOU's language was unambiguous and established that Smith's royalties were to be calculated from the OVF royalty pool. The court found support for its interpretation in (1) a recital in the MOU, concerning Vision's desire to compensate Smith "similar" to what Creek and Burton might receive as a result of their interests in Friends,

15

(2) Smith's May 22, 2017, e-mail to Burton, and (3) the testimony that Smith's 2% and 3% share of the wind farm was meant to be equivalent to a 20% and 30% interest in Friends. Smith asserts these matters were extrinsic evidence, and the court erred by considering them.

¶ 56    We first address the court's reliance on the MOU's recitals. Recitals shed light on the circumstances surrounding a contract's formation. *Id.* at 44. Generally, "recitals are only preliminary in nature and will not, of themselves, be considered binding obligations on the parties or an effective part of their agreement unless referred to in the operative portion of their agreement." *Id.* at 45. "[W]hile recitals are not [an] operational part of [a] contract between the parties, they reflect the intent of the parties and influence the way the parties constructed the contract." *Id.* at 48.

¶ 57    The MOU contained seven recitals setting forth the factual circumstances surrounding the MOU and expressly stating the parties' intent. Specifically, the recitals established the following. K4 Wind Farm, LLC, was developing the K4 Wind Farm. Friends had four members: Burton, who owned 30%; Creek, who owned 30%; Harris, who owned 40%; and Vision, which was managing member but owned 0%. Friends owned 10% of K4 Wind Farm, LLC. Burton and Creek each owned 30% of Friends, and they had previously agreed to reduced compensation as a condition of their admission to Friends. Smith was a valuable contributor to the project and committed to working on the project until its completion. Smith was not and could not be admitted to Friends, however, because she was "not known" when it was formed and admitting her now would cause legal complications for Friends and "Friends['] relationship with other entities that are also owners of [K4 Wind Farm, LLC]." And although Smith had not taken reduced compensation like Burton and Creek, Vision desired to provide her with compensation "similar to what Creek or Burton may receive as a result of Creek or Burton's membership interest in Friends."

16

¶ 58    Smith argues the recitals should be completely ignored because the MOU's operative provision did not incorporate them, meaning they are not binding provisions of the MOU. Though Smith does not squarely state it, she essentially argues the words "Now therefore" are not sufficient to render the MOU's recitals binding. Smith's argument is based on the four-corners rule. That rule states that courts should not consider extrinsic evidence to determine a contract's meaning unless the language used is ambiguous. See *Air Safety, Inc. v. Teachers Realty Corp.*, 185 Ill. 2d 457, 462 (1999). According to Smith, anything outside the MOU's operative provision—recitals included—is extrinsic evidence and cannot be considered absent a finding that the MOU's operative provision is ambiguous. And because the contract is unambiguous, she continues, the court should not have considered the recitals.

¶ 59    We disagree. The recitals are not extrinsic to the MOU; they are within the MOU's four corners. Smith has not cited any authority holding that recitals are extrinsic evidence that may not be considered when interpreting a contract. To the contrary, in *First Bank & Trust*, we noted that recitals, even if not binding, are not extrinsic evidence and found no error in the trial court's reliance on them when interpreting a contract. *First Bank & Trust*, 338 Ill. App. 3d at 47. In our discussion, we noted a recent trend in which courts have moved away from the four-corners rule in favor of a more pragmatic approach, where extrinsic evidence of a contract's surrounding circumstances may inform its interpretation. *Id.* at 47-48. We further noted that, as part of this trend, some panels of this court have approved the more liberal approach. *Id.* at 46-47 (citing in *In re Estate of Constantine*, 305 Ill. App. 3d 256, 260 (1999)). We then wrote the following:

        "In the instant case, we need not even go so far as to adopt the furthest extent of this liberal approach because we are presented with the circumstances surrounding the execution of [an] amendment [to a previous agreement] *within that document's own four*

17

*corners*. That is, we need not turn to evidence outside the contract between the parties as did the court in *Estate of Constantine*, because the recitals in the amendment discuss the circumstances surrounding the parties' execution of the amendment here. Though not operational, the recitals created a context through which the operational portion of the amendment could be construed in relation to both the prior Agreement and [the parties'] intent at the time they later executed the amendment. *It would be illogical to ignore the recitals that are included on the same page as the body of the amendment and are so indicative of the surrounding circumstances relevant to its execution.*" (Emphases added.) *Id.* at 48 (citing *Yeomans v. Brown*, 239 Ill. App. 117, 124 (1925), and citing 5 Margaret N. Kniffin, Corbin on Contracts § 24.7, at 37 (rev. ed. 1998)).

¶ 60     We find *First Bank and Trust*'s reasoning persuasive. The recitals here were not extrinsic to the MOU; they were contained within the MOU's four corners and their consideration does not violate the four-corners rule. Even if not operative, the recitals state the parties' intent and set forth the factual backdrop for the MOU's operative provision. *Id.*; see *In re Estate of Holms*, 2019 IL App (2d) 190139, ¶¶ 26-27 (using recital to bolster an interpretation of property settlement agreement despite there being no ambiguity); *In re Marriage of Woodrum*, 2018 IL App (3d) 170369, ¶¶ 109-11 (same); *Cress v. Recreation Services, Inc.*, 341 Ill. App. 3d 149, 169-70 (2003) (same). Like the court in *First Bank & Trust*, we believe it would be illogical to ignore the MOU's recitals and interpret the MOU's operative provision in isolation, particularly when the parties felt it important enough to include that factual context in the MOU.

¶ 61     Additionally, excluding the MOU's recitals from consideration runs afoul of the well-settled principles that a contract must be read as a whole, that each word in a contract must be given effect, and that no word should be rendered superfluous. *First Bank & Trust*, 338 Ill. App.

18

3d at 40. The recitals are immediately followed by the operative provision, which begins with the words, "Now therefore." We must give effect to those words, and our interpretation of the MOU may not render them superfluous. *Id.* The parties' use of "Now therefore" signified the MOU's operative provision was agreed to *because of* the specific factual circumstances that were written into the agreement. See Black's Law Dictionary 1781 (11th ed. 2019) ("therefore" means "[f]or that reason" or "on *** those grounds" or "[t]o that end"); Merriam Webster's Collegiate Dictionary 1296 (11th ed. 2020) ("therefore" means "for that reason," "consequently," "because of that," "on that ground," or "to that end"). Thus, the words "Now therefore" create a logical link, grounding the operative provision in the recitals' contextual basis. To be sure, the words "Now therefore" here may not have rendered the recitals binding to the extent they created a right or obligation that was not otherwise stated in the MOU's operative provision. See *Illinois Housing Development Authority v. M-Z Construction Corp.*, 110 Ill. App. 3d 129, 144-45 (1982) (the words, "NOW, THEREFORE," before the operative provisions of a contract did not show an intent to incorporate the arbitration provision of a contract referred to in the recitals). However, we believe the words were sufficient to bring the recitals into the interpretive equation.

¶ 62 We turn now to the MOU's operative provision. Smith asserts the operative provision is unambiguous and provides her with either 2% or 3% (depending on megawattage) of the total royalty pool. Under Smith's interpretation, "any and all portions of the K4 Wind Farm" means "any and all royalties generated from EDF's construction and operation of the K4 Wind Farm." We do not disagree that the MOU is unambiguous. However, we disagree with Smith's interpretation of it. See *Clanton v. Oakbrook Healthcare Centre, Ltd.*, 2023 IL 129067, ¶ 33 (a contract is not ambiguous just because there is a dispute as to its meaning).

19

¶ 63    At the outset, we find Smith's interpretation of the MOU contravenes the legal maxim that one cannot give away what one does not have. See *A.J. Maggio Co. v. Willis*, 316 Ill. App. 3d 1043, 1047 (2000). This principle, sometimes expressed as *nemo dat quod non habet*—that is, no one gives who does not possess—has long been a cornerstone of property law. See *Louisville & Nashville R.R. Co. v. Illinois Central R.R. Co.*, 174 Ill. 448, 454 (1898); see also Black's Law Dictionary 1983 (11th ed. 2019). It underscores that property transmission is limited to what the grantor lawfully holds. *Munroe v. Brower Realty & Management Co.*, 206 Ill. App. 3d 699, 705 (1990); see 73 C.J.S. *Property* § 57 (2024).

¶ 64    Vision and Smith agreed to the MOU in July 2012. At that time, Vision's 45% interest in OVF entitled it to a 45% interest in K4 Wind Farm, LLC, which held the project assets. Vision's interest, however, did not entitle it to 45% of the total royalty pool. This is because in 2011, MAP obtained an interest in the total royalty pool when it entered the joint venture with OVF to monetize the wind farm and ultimately divide the total royalty pool. Thus, at the time Vision and Smith signed the MOU, Vision could only convey its 45% share of the OVF royalty pool, and nothing more.

¶ 65    Under Smith's reading of the contract, Vision agreed to transfer more than it owned. Smith's reading requires Vision to remit 2% and 3% of the total royalty pool, despite owning only a fraction of a fraction of the total royalty pool via its interest in OVF. Such a reading would mean Vision granted Smith rights in the property of strangers—MAP, Orion, and Friends—who were not parties to the MOU. We cannot interpret the MOU in this manner. See *Munroe*, 206 Ill. App. 3d at 705; *Cadle Company II, Inc. v. Stauffenberg*, 221 Ill. App. 3d 267, 269-70 (1991) (a conveyance is void to the extent it purports to pass an interest greater than the grantor possesses).

¶ 66        Understanding what Vision could, in fact, grant Smith, we find the trial court correctly interpreted the MOU to mean Smith was entitled to either 2% or 3% (depending on megawattage) of the OVF royalty pool. Again, the MOU's operative provision stated,

> "Vision *** agrees to provide *** Smith with compensation equal to 2% of any and all portions of the K4 Wind Farm up to 150 [megawatts] and 3% of any and all portions of the K4 Wind Farm over 150 [megawatts], said compensation being of same like kind and at the same time as received by said member of Friends."

The recitals established that Smith was not and could not become a member of Friends and had not agreed to take reduced compensation. Despite this, Vision provided Smith with compensation similar to what the members of Friends would receive, because of the value she brought to Vision's efforts.

¶ 67        We will not, as Smith's interpretation would require, rewrite the operative provision to state that Smith's compensation was to be equal to 2% and 3% of any and all royalties generated by EDF's operation of the K4 Wind Farm. Reading the MOU as a whole, we find the compensation Vision agreed to pay Smith was to be calculated from the OVF royalty pool. The MOU provided Smith's compensation was to be "similar to" and "of [the] same like kind *** as" the compensation received by Burton and Creek. The MOU does not qualify in what regard Smith's compensation should be "similar to" and "of the same like kind *** as" Burton and Creek's compensation. Thus, we construe this language as requiring similarity in every relevant respect.

¶ 68        The evidence at trial showed that Burton and Creek's compensation via their memberships in Friends was derived from the OVF royalty pool, after OVF and MAP took their shares of the total royalty pool. The source of Burton and Creek's compensation is a relevant characteristic of

21

their compensation. Because Smith's compensation is to be similar in every relevant respect share relevant characteristics, her compensation is to be calculated from the same source.

¶ 69    According to the evidence at trial, Creek was entitled to $138,779.10 in energy-production royalties via his membership in Friends as of the date of trial. Using the same royalty pool, the trial court determined Smith was entitled to $155,214.14 in unpaid energy-production royalties, approximately 1.11 times Burton and Creek's compensation via their 30% interests in Friends. Under Smith's proposed calculation, however, she was entitled to $368,076.52 in unpaid energy-production royalties over the same time period, approximately 2.65 times Burton and Creek's compensation. We fail to see how a person's compensation that is 2.65 times another's is similar, especially where the competing interpretation provided Smith with compensation that was 1.11 times Burton and Creek's compensation. Accordingly, we conclude the trial court applied the correct measure of damages when it calculated Smith's royalties from the OVF royalty pool.

¶ 70    In reaching our conclusion, we note our consideration of the recitals has not created any obligations that were not already stated in the MOU's operative provisions. The recitals have merely informed our interpretation of the MOU's operative provision. When viewed in light of the recitals, as well as what Vision could actually grant, we find the MOU's plain language leads to one conclusion: when the parties entered the MOU, they intended Smith's royalty-derived compensation to be calculated from the OVF pool, similar to what Burton and Creek would receive via their interests in Friends.

¶ 71    Before concluding on this issue, we briefly address and reject Smith's arguments regarding the court's reliance on Smith's May 22, 2017, e-mail to Burton and Hunt, and the testimony that Smith's 2% and 3% share of the wind farm was equivalent to a 20% and 30% interest in Friends.

22

¶ 72      As to Smith's May 22, 2017, e-mail, we emphasize that *Smith* introduced and sought admission of her May 22, 2017, e-mail during her direct examination, presumably to corroborate her testimony that Vision stopped paying her royalties after she began questioning how her payments were calculated. In the e-mail, Smith asked to inspect bookkeeping records and bank statements so she could determine how her royalties were being calculated. However, in the same e-mail, Smith stated she was "still waiting to receive 4th quarter payments from Pilot Hill (*20%* up to 150 [megawatts] and *30%* for 25 [megawatts] and Kelly Creek (*30%* for all)." (Emphases added.) The court found this confirmed what the MOU stated—namely, that Smith's 2% and 3% shares were similar to what Burton and Creek would receive via their membership in Friends.

¶ 73      A party cannot introduce evidence and then later claim it was error for the court to consider it. *Gillespie v. Chrysler Motors Corp.*, 135 Ill. 2d 363, 374 (1990). It is not clear why Smith introduced the May 22, 2017, e-mail—the question of Vision's breach was taken out of issue at summary judgment. Regardless of her purpose for introducing the e-mail, however, Smith cannot complain that the trial court relied on it when she herself introduced it. The e-mail confirmed, by Smith's own words, that she understood the compensation she received via her 2% and 3% interest in "any and all portions of the K4 Wind Farm" was to be similar to the compensation Creek and Burton received from their 30% interests in Friends. That is, it confirmed her understanding that her compensation was to be equivalent to 2% and 3% of the OVF royalty pool.

¶ 74      Smith also objects to the court's reliance on Smith and Hunt's testimony that confirmed the parties agreed to compensation "similar" to what Burton and Creek were to receive via their membership in Friends. To the extent it was error to rely on Smith and Hunt's testimony on this subject, the error was harmless. The testimony was merely cumulative to what was already

23

established by the MOU's plain language. See *First Midwest Bank v. Rossi*, 2023 IL App (4th) 220643, ¶ 172.

¶ 75    In sum, we conclude the trial court applied the correct measure of damages, based on the MOU's plain language. Because the evidence presented supported the trial court's ultimate calculation, the trial court's damages award was not against the manifest weight of the evidence.

¶ 76                                    B. Prejudgment Interest

¶ 77    Smith also contends the trial court erred when it rejected her request for prejudgment interest under section 2 of the Interest Act (815 ILCS 205/2 (West 2022)). Specifically, she argues the trial court improperly found she was not a "creditor" as that term is used in the statute. We agree.

¶ 78    Section 2 reads as follows: "Creditors shall be allowed to receive at the rate of five (5) per centum per annum for all moneys after they become due on any bond, bill, promissory note, or other instrument of writing; *** and on money withheld by an unreasonable and vexatious delay of payment." *Id.* Prejudgment interest under section 2 is intended to fully compensate an injured party for the monetary loss caused by the failure to pay money when due. *Milligan v. Gorman*, 348 Ill. App. 3d 411, 416 (2004). It is premised on a recognition that "the use of money is worth money." (Internal quotation marks omitted.) *Id.*

¶ 79    When a written instrument establishes an amount due and the time for payment, the creditor has a statutory right to interest. *Id.* The amount due must be liquidated or easily computed. *Oak Park Trust & Savings Bank v. Intercounty Title Co. of Illinois*, 287 Ill. App. 3d 647, 654 (1997). At base, "[t]he amount must be due in the sense that a debtor-creditor relationship has come into being." *La Grange Metal Products v. Pettibone Mulliken Corp.*, 106 Ill. App. 3d 1046, 1054

24

(1982). Interest should be awarded even when a good-faith defense exists and when the claimed right or the amount due requires a legal determination. *Id.*

¶ 80   We give deference to a trial court's decision regarding interest on a judgment. *Milligan*, 348 Ill. App. 3d at 415. Thus, we review the court's factual findings against the manifest weight of the evidence, disturbing those findings only if they have no basis in the evidence. *Id.*; see *Certain Underwriters at Lloyd's, London v. Abbott Laboratories*, 2014 IL App (1st) 132020, ¶ 71 (award of prejudgment interest is reviewed for an abuse of discretion).

¶ 81   The MOU is a written royalties contract and therefore qualifies as an "instrument of writing" for purposes of section 2. Further, the MOU prescribes a time for payment—"at the same time" as the members of Friends—and a formula for calculating royalties from a determinable amount—"2% of any and all portions of the K4 Wind Farm up to 150 [megawatts] and 3% of any and all portions of the K4 Wind Farm over 150 [megawatts]." Vision and Hunt do not argue otherwise.

¶ 82   Instead, Vision and Hunt assert the trial court correctly denied interest for two reasons: (1) the amount due was not liquidated or easily computed but rather required an exercise of judgment, discretion, or opinion, and (2) the court correctly found Smith was not a creditor. We address Vision's second argument first.

¶ 83   The trial court rejected Smith's claim for prejudgment interest based on its unexplained finding that Smith was not a creditor. See 815 ILCS 205/2 (West 2022) (providing "creditors" are entitled to interest on money after it becomes due on a written instrument). We conclude the court's finding was not supported by the evidence.

¶ 84   The Interest Act does not define "creditor." Thus, we turn to the dictionary, keeping in mind the statute's purpose. *Milligan*, 348 Ill. App. 3d at 416; *Langendorf v. City of Urbana*, 197

Ill. 2d 100, 109 (2001) ("When the terms of a statute are not specifically defined, the words must be given their popularly understood meanings construed with reference to the purposes and objectives of the statute."). A "creditor" is "[o]ne to whom a debt is owed" or "[a] person *** with a definite claim against another, esp[ecially] a claim that is capable of adjustment and liquidation." Black's Law Dictionary 464 (11th ed. 2019); see Merriam-Webster's Collegiate Dictionary 294 (11th ed. 2020) (a "creditor" is "one to whom a debt is owed," especially "a person to whom money or goods are due").

¶ 85        Here, the evidence established that Smith was a creditor for purposes of the Interest Act. The MOU provided Vision would pay Smith money (royalties based on a percentage share of receipts) at the same time that Friends received payments (45 days after each quarter's end). Thus, on the date each payment was due, Vision owed money to Smith under a written instrument, meaning Smith was a creditor for purposes of the Interest Act. The trial court's contrary conclusion was against the manifest weight of the evidence.

¶ 86        In reaching our conclusion, we reject Vision and Hunt's reliance on *General Dynamics Corp. v. Zion State Bank & Trust Co.*, 86 Ill. 2d 135 (1981) and *Kansas Quality Construction, Inc. v. Chiasson*, 112 Ill. App. 2d 277 (1969), because neither case supports the trial court's finding that Smith was not a creditor. Indeed, neither case analyzed whether the plaintiff was a creditor. The issue in *General Dynamics* was whether the trial court correctly refused to award interest based on its finding that the defendant's delayed payment was not unreasonable and vexatious. *General Dynamics*, 86 Ill. 2d at 140-41; see 815 ILCS 205/2 (West 2022) (creditors are entitled to 5% interest "on money withheld by an unreasonable and vexatious delay of payment"). And in *Kansas Quality Construction*, the court *reversed* the trial court's denial of interest because the written instrument fixed the amount and time for payment of a builder's fee, even though there

26

was a reasonable dispute as to the defendant's liability. *Kansas Quality Construction*, 112 Ill. App. 2d at 287-88.

¶ 87    Vision and Hunt nevertheless argue that the trial court correctly denied interest because the amount due under the MOU was not liquidated. In support, they cite this court's decision in *Logue v. Cline Financial Concepts, LLC*, 2024 IL App (3d) 230114-U. We disagree.

¶ 88    As noted, interest should be awarded when the amount due is liquidated or easily calculated (*Oak Park Trust & Savings Bank*, 287 Ill. App. 3d at 654), even when a good faith defense exists or the claimed right and the amount due require a legal determination. *La Grange Metal Products*, 106 Ill. App. 3d at 1054. An amount is not liquidated when "judgment, discretion, or opinion, as distinguished from calculation or computation is required to determine the amount of the claim." (Internal quotation marks omitted.) *Certain Underwriters*, 2014 IL App (1st) 132020, ¶ 71.

¶ 89    We conclude the amount due under the written instrument was easily calculated, and Smith was therefore entitled to interest under section 2. To be sure, the court here was required to exercise some judgment when it awarded damages to Smith. It had to determine, based upon the MOU's language, whether Smith's share of the royalties should be calculated from the total royalty pool or the OVF royalty pool. But once that *legal issue* was determined, the contract prescribed a formula that neither party disputed, and the parties agreed on the amount in each royalty pool. In other words, the amount of damages simply required the multiplication of agreed-upon numbers.

¶ 90    Vision and Hunt's reliance on *Logue* is misplaced.[8] The type of damages at issue in *Logue* was *anticipated* investment fees and commissions, which by nature are not easily ascertainable. *Logue*, 2024 IL App (3d) 230114-U, ¶¶ 56, 74. Further, in awarding damages, the trial court in

---

[8]As an aside, *Logue* is not binding authority but rather persuasive. See Ill. S. Ct. R. 23(e) (eff. Feb. 1, 2023) (an order filed under Rule 23(b) after January 1, 2021, is not precedent but may be cited for persuasive purposes).

*Logue* considered "whether and to what degree [the plaintiff's own] conduct impacted anticipated fees *** and whether and to what degree [the plaintiff's] conduct warranted a reduction in his award." *Id.* ¶ 74. These considerations demonstrated the claim in *Logue* was unliquidated, as the trial court was required to exercise discretion and not simply apply a formula to uncontroverted facts. *Id.*

¶ 91     Here, the damages at issue depended solely on the amount of revenue generated by a third-party sale of energy, which was not and cannot be impacted by either party's conduct. And as noted, once the court interpreted the MOU, there was no room for difference of opinion on the proper amount of damages; it was simple math.

¶ 92     Finally, Vision argues the disparity in the amount sought by Smith and the amount awarded by the trial court demonstrates the claim was unliquidated. We are not persuaded.

¶ 93     We acknowledge a disparity between the amount sought and the amount awarded may support a finding that a claim is unliquidated. See *Farwell Construction Co. v. Ticktin*, 84 Ill. App. 3d 791, 810 (1980) ("Furthermore, the significant difference between the amount demanded in plaintiff's amended complaint *** and the trial court's amended judgment *** is further indication that the amount due was not readily ascertainable."). We disagree, however, that a disparity alone warrants the denial of interest. For instance, in *Farwell*, which involved a real-estate contract, the court relied on two additional factors in upholding the trial court's denial of prejudgment interest: the contract price was contingent upon which credits were allowed and in what amounts, and the real estate's market value was disputable. *Id.* at 809-10.

¶ 94     The remaining cases cited by Vision and Hunt likewise provide no support for its assertion. In those cases, *the plaintiffs* submitted various calculations of damages, demonstrating the uncertainty of their own claimed damages. See *Alguire v. Walker*, 154 Ill. App. 3d 438, 448 (1987);

28

*Euroholdings Capital & Investment Corp. v. Harris Trust & Savings Bank*, 602 F. Supp. 2d 928, 941 (N.D. Ill. 2009) (the court also noted the damages sought were lost profits, which are generally uncertain); *Movitz v. First National Bank of Chicago*, 982 F. Supp. 566, 569 (N.D. Ill. 1997) (the court also found the plaintiff had established none of the statutory prerequisites to an award of interest under section 2).[9]

¶ 95 In this case, Smith submitted one damages calculation based upon her interpretation of the MOU, which was that her share was to be calculated from the total royalty pool. Vision submitted a different interpretation. This dispute did not render the claim unliquidated. As stated above, the amount due was easily calculated after the court made its legal determination as to how the MOU should be interpreted. Because Smith was a creditor and the amount due was liquidated, we conclude the trial court erred by denying Smith prejudgment interest. In light of our conclusion, we need not address Smith's alternative argument that interest was warranted because Vision and Hunt's delayed payment was unreasonable and vexatious. We reverse the portion of the trial court's judgment denying Smith interest under section 2 and remand the matter for the court to calculate and award interest to her.

¶ 96           III. CONCLUSION

¶ 97 For the reasons stated, we affirm in part and reverse in part, and we remand the matter for further proceedings.

¶ 98 Affirmed in part and reversed in part.

¶ 99 Cause remanded.

¶ 100 JUSTICE ANDERSON, specially concurring:

---

[9]*Euroholdings* and *Movitz* are federal district court cases and do not bind us. *County of Du Page v. Lake Street Spa, Inc.*, 395 Ill. App. 3d 110, 122 (2009).

¶ 101        I agree with the majority's conclusion—but its analysis throws caution to the wind.

¶ 102        Traditionally, when a contract is clear on its face, we interpret it as a matter of law, staying firmly within its four corners. See *Air Safety, Inc. v. Teachers Realty Corp.*, 185 Ill. 2d 457, 462 (1999). But if a patent ambiguity exists, then parol evidence can help clear the air. *Id.* at 462-63. The Illinois Appellate Court has even considered extrinsic evidence provisionally to determine whether a latent ambiguity exists, especially where there is no integration clause. See *id.* at 463-64 (collecting cases but declining to reach the question of provisional admissibility).

¶ 103        Recitals and "whereas" clauses are like the prevailing winds of a contract—they set the direction but do not generate any real power unless incorporated into the operative terms. See *McMahon v. Hines*, 298 Ill. App. 3d 231, 237 (1998). That said, they can help steer interpretation when ambiguity clouds the forecast, as it does here. In my view, the recitals are relevant in this case because the agreement is patently ambiguous, and the trial judge was right to consider them. Her overall interpretation of the agreement was correct.

¶ 104        I write separately, however, because I think the court in *First Bank and Trust*—and the majority here—are overstating the supposed "trend" toward a more "liberal" or "pragmatic" approach to contract interpretation. *Supra ¶* 59; *First Bank & Trust Co. of Illinois v. Village of Orland Hills*, 338 Ill. App. 3d 35, 47 (2003). There are at least three problems here.

¶ 105        First, the cases the *First Bank & Trust* court cites to support this "trend" do not reflect a movement away from the four corners rule in general terms, as that decision and the majority here suggest. *First Bank & Trust*, 338 Ill. App. 3d at 47-48. Rather, those cases involved situations where the courts went beyond the four corners because of a patent ambiguity, or to identify the existence of a latent ambiguity. Indeed, in *Dungey v. Haines & Britton, Ltd.*, 155 Ill. 2d 329, 336 (1993), our supreme court held that extrinsic evidence may be considered "in determining whether

an ambiguity exists." In *Ahsan v. Eagle, Inc.*, 287 Ill. App. 3d 788, 790 (1997), the court acknowledged "the current trend in Illinois law which allows a court to consider parole evidence provisionally to determine if an agreement that appears to be clear on its face is actually ambiguous." (Emphasis omitted.) And, in *URS Corp. v. Ash*, 101 Ill. App. 3d 229, 235 (1981), the court held that trial judges can go beyond the four corners to "determine with greater certainty whether in fact an ambiguity does exist" and "if it appears that a word or phrase has a fixed meaning either by law or by usage and custom, then the 'four corners' rule will be applied."

¶ 106        Second, the notion that courts can depart from the four corners rule in instances of ambiguity is not new. It is an established part of our jurisprudence. See, *e.g.*, *Gillett v. Teel*, 272 Ill. 106, 115 (1916) (considering extrinsic evidence).

¶ 107        Third, while recitals can provide useful context, they do not generate binding obligations unless the contract explicitly harnesses them in its operative provisions. Practically speaking, that is what happened in *First Bank & Trust*, where the contract's substantive terms mirrored the recitals, giving them real force. See *First Bank & Trust*, 338 Ill. App. 3d at 45. That is not the case here. We should not be giving recitals more influence than is appropriate.

¶ 108        In short, I see neither a trend nor novelty arising from the use of extrinsic evidence to interpret an ambiguous agreement. I write not to be blustery but because I fear the broad suggestion that we are moving away from the four corners rule toward a more "liberal" or "pragmatic" approach could signal an improper change in the wind. Simply put, *First Bank & Trust* opened the door to extrinsic evidence far more than was necessary, and we should not be propping it open— even if the use of extrinsic was appropriate in this case because of an ambiguity.

¶ 109        For those reasons, I concur with the majority's ultimate conclusion but disagree with its analysis.

31

*Vision Energy, LLC v. Smith*, 2025 IL App (3d) 240114

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Kankakee County, No. 21-MR-116; the Hon. Lindsay A. Parkhurst, Judge, presiding. |
| **Attorneys for Appellant:** | John J. Boyd, of Boyd Legal Services PC, of Bourbonnais, and William H. Blessing, of Blessing & Wallace LLC, of Cincinnati, Ohio, for appellant. |
| **Attorneys for Appellee:** | Michael J. Parish, of Kankakee, and Kevin F. Hoskins (*pro hac vice*) and Richard G. Meyer (*pro hac vice*), of Dressman Benzinger LaVelle PSC, of Cincinnati, Ohio, for appellees. |